**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Dempsey Buford MERIDA, David Lee Merida, William Benjamin King, Tim Walker and Billy Ray Lilley, Defendants-Appellants.**

**No. 84–1066.**

United States Court of Appeals,
Fifth Circuit.

June 27, 1985.

Rehearing Denied July 31, 1985.

Robert O. Dawson, Austin, Tex., for David Merida.

Don Ervin, Houston, Tex., for Lilley.

Hugh Lowe, Austin, Tex., for Dempsey Buford Merida.

Edward C. Prado, U.S. Atty., John E. Murphy, Ms. Sidney Powell, Asst. U.S. Attys., San Antonio, Tex., for U.S.

Before GEE, POLITZ and WILLIAMS, Circuit Judges.

POLITZ, Circuit Judge:

Following an eight-week trial, the jury returned verdicts of guilty on multiple counts of violations of the drug laws by Dempsey Buford Merida, David Lee Merida, William Benjamin King, Tim Walker, and Billy Ray Lilley. Defendants appeal, claiming various trial court errors. Finding no merit in any assignment of error, we affirm all convictions.

## FACTUAL BACKGROUND

This case is the culmination of an extensive investigation into a criminal operation cognomened the Dempsey Merida Organization. The organization developed and operated a criminal enterprise engaged in the manufacture, importation and distribution of controlled substances notably including heroin, cocaine, marihuana, amphetamines and methamphetamines. According to the scenario unveiled by the evidence, the organization, in support of its drug operations, engaged in vehicle and heavy equipment theft and numerous other crimes, perhaps even homicides. Headquartered in the Houston area, the organization's tentacles reached across state lines from Florida to Nevada and across international borders to points in Mexico and Belize. Dempsey Buford Merida headed the organization, assisted by William "Red" Follis, his chief lieutenant, and Charles "Chuck" Newlin, his attorney. The other defendants, Dempsey's son David, King, Walker, and Lilley, all served in lower eche-

Brock Huffman, Michael J. Black, San Antonio, Tex. (court-appointed), for King.

Kent A. Schaffer, Houston, Tex., for Walker.

lon positions in the organization's heirarchy.

By 1975 the organization was dealing in large quantities of cocaine. From 1975 to 1978, Don Abbajay, who eventually became an informant for the Drug Enforcement Administration, regularly delivered cocaine in five-kilo shipments, from Lee Chagra in El Paso to the Merida Organization. Chagra was murdered in 1978 and Abbajay moved to Houston, using Conserve Electric Company as a front for his drug trafficking activities. The Conserve Electric warehouse became the organization's storage facility, pending distribution, for large quantities of controlled substances.

The organization grew during the decade of the seventies and by 1980 it had amphetamine and methamphetamine laboratories in several states. Robert Carpenter joined the Houston activities as a procurer of precurser chemicals, supplies, and equipment. Carpenter was introduced to the organization's operation when he fell behind in rental payments due on a warehouse he leased from Dempsey Merida. Carpenter first stored chemicals and glassware which originally were described as oil field explosives. David Merida later leased a truck to transport the stored items to a laboratory in a barn on a ranch owned by Ronald Dale Dunn near Johnson City, Texas. When Dempsey Merida told Carpenter to buy more chemicals Carpenter demurred, telling the elder Merida that he now knew the chemicals were being used to make "dope" and that he wanted out. Carpenter testified [1] that when Dempsey Merida threatened his life and that of his family, he continued to acquire chemicals and equipment for the Dunn laboratory until that laboratory was made the subject of a search warrant and he and Dunn were arrested. [2]

Following the arrest of Carpenter and Dunn, Dempsey Merida dispatched Newlin to represent them with instructions to make certain that they did not implicate any member of the Merida clan. Their silence was assured by both the carrot and the stick. If they maintained silence their families would be taken care of during their absence. If they broke silence, they were told that their families would be taken care of, but not in the paternalistic manner proposed in the first option. Dempsey Merida personally confirmed both the advice and the threats.

Upon the heels of the closure of the laboratory at Dunn's ranch, the organization arranged for an alternate site in Louisiana. Dunn, Newlin, Follis, James Edwards, and another of Dempsey Merida's sons, John, planned and set up another clandestine laboratory which produced more than 400 pounds of amphetamine in the period May-July 1981. During that period Dempsey Merida acquired 4,000 pounds of marihuana from a source in Arizona. His sons and Grady Patton distributed 400 pounds. The quality was poor and the balance was returned. At the same time, Newlin, Edwards, Walker, another lieutenant, D.C. McCauley, and Lon Robbins, a DEA informant, attempted to set up an amphetamine lab in Atlanta, Georgia. Their efforts were unsuccessful because arrangements could not be consummated with a local pharmacist who was to aid in the illicit activity.

In the spring of 1981 the organization expanded its operation into the importation of heroin and the theft of heavy equipment because the latter proved to be an effective means of attracting and paying Mexican suppliers. Oscar Valera of Reynosa, Mexico agreed to furnish the organization with an unlimited supply of heroin in exchange

---

1. Carpenter testified as a government witness pursuant to a plea agreement. He is in the Witness Protection Program.

2. Dunn and Carpenter were convicted of conspiracy to manufacture and possess amphetamine with the intent to distribute. On appeal this court upheld Carpenter's conviction but reversed Dunn's conviction finding that the search

of the ranch was illegal. *United States v. Dunn,* 674 F.2d 1093 (5th Cir.1982). The Supreme Court vacated this court's opinion, — U.S. —, 104 S.Ct. 2380, 81 L.Ed.2d 340 (1984), and remanded for reconsideration in light of *Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). The remand is pending.

for cash and heavy equipment. Follis, Carpenter and Mac Montgomery stole targeted equipment and transported it to the Valley in South Texas where it was exchanged for multi-kilo quantities of heroin. Several such shipments were made in late 1981. In October the organization received five kilos of heroin, giving in payment $50,000 in equipment and $200,000 in cash. This shipment was divided in Houston between King (one kilo), Montgomery (one kilo), Hayes Jackson (two kilos), and Gary Mickelson (one pound). Shortly thereafter another five-kilo shipment was received. King put up $140,000 from the sale of his earlier kilo and received a kilo and a pound. Mickelson tendered $100,000 from monies received from sale of his earlier allotment and received a kilo. Follis received a pound. The cash payment was augmented by stolen tractors with backhoe attachments fancied by the Mexican source.

King remained active in the cocaine trafficking. In January of 1982 he and Lilley purchased amphetamines from Abbajay. Later when Abbajay ran out of drugs, Lilley had King deliver to Abbajay a "care package" containing heroin, cocaine, and amphetamines.

During late 1981 and early 1982 the organization took steps to import marihuana and cocaine paste from Belize. Their efforts met with limited success. The first load of contraband was dumped somewhere near Nuevo Progresso, Mexico when the airplane ran out of fuel. Bad fuel caused an abort of the second attempt when that aircraft crash-landed in Mexico while Dempsey and David Merida, accompanied by several others, awaited its cargo which was to be air-dropped to a secluded pasture on a ranch near El Campo, Texas. The third attempt was successful. Dempsey Merida, Follis, and Montgomery arranged for the smuggling of 500 pounds of marihuana from Belize to Tennessee. Arrests

foiled the fourth attempt when the pilot and 400 pounds of marihuana were taken into *custodia legis* in Mississippi, and the fifth attempt when Anthony Stonedale and Ormand Mayer were arrested shortly after receiving 750 pounds of marihuana at a clandestine grass strip near Houston.

More factual detail is set forth in the introductory paragraphs to discussions of various assignments of error, *infra.*

On April 6, 1983 the grand jury indicted Dempsey, David and John Merida, Follis, Newlin,[3] Dunn, McCauley, Edwards,[4] Montgomery, Mickelson, Jackson, King, Mayer, Walker, Stonedale and 16 other members of the Merida Organization.[5]

Dempsey and David Merida, King, Walker, and Lilley were jointly tried. Dempsey Merida was found guilty of 16 counts: continuing criminal enterprise; conspiracy to manufacture methamphetamine and amphetamine; conspiracy to distribute and to possess with intent to distribute amphetamine and methamphetamine; conspiracy to import amphetamine and methamphetamine; conspiracy to possess with intent to distribute cocaine; conspiracy to import cocaine; conspiracy to possess with intent to distribute heroin; conspiracy to import heroin; conspiracy to possess with intent to distribute marihuana; conspiracy to import marihuana; aiding and abetting possession with intent to distribute amphetamine; two counts of aiding and abetting possession with intent to distribute heroin; aiding and abetting possession with intent to distribute cocaine; aiding and abetting importation of cocaine; and possession with intent to distribute cocaine. 21 U.S.C. §§ 841(a)(1), 846, 848, 952(a), 960, and 963 and 18 U.S.C. § 2. David Merida was convicted on four counts: conspiracy to manufacture methamphetamine and amphetamine; conspiracy to distribute and to possess with intent to distribute amphetamine

3. Newlin pleaded guilty to three five-year counts, resigned from the bar and testified as a government witness.

4. Edwards pleaded guilty to a five-year count and testified as a government witness.

5. The indictments were sealed and remained secret until after execution of a search warrant at Dempsey Merida's home on April 20, 1983.

and methamphetamine; conspiracy to possess with intent to distribute marihuana; and conspiracy to import marihuana. He was acquitted of conspiracy to import amphetamine and methamphetamine. 21 U.S.C. §§ 841(a)(1), 846, 952(a) and 963. King was convicted of conspiracy to possess with intent to distribute cocaine and conspiracy to possess with intent to distribute heroin. King was acquitted of the charges of conspiracy to import cocaine and conspiracy to import heroin. 21 U.S.C. §§ 841(a)(1) and 846. Walker was convicted of conspiracy to manufacture methamphetamine and amphetamine and conspiracy to distribute and to possess with intent to distribute amphetamine and methamphetamine. Walker was acquitted of conspiracy to import amphetamine and methamphetamine. 21 U.S.C. §§ 841(a)(1) and 846. Lilley was convicted of conspiracy to possess with intent to distribute cocaine and possession with intent to distribute cocaine and was acquitted of charges of aiding and abetting the importation of cocaine and conspiracy to import cocaine. 21 U.S.C. §§ 841(a)(1) and 846.

### Assignments of Error

All defendants appeal, raising various challenges to their trial and convictions. Dempsey and David Merida challenge the admissibility of certain evidence seized from the Merida residence at the time of their arrest and raise *Jencks* and *Brady* claims relative to DEA interview report forms and payment vouchers for government informants and witnesses. Dempsey Merida also contends that the trial judge unduly restricted cross-examination of government witnesses. King, Lilley and Walker contend that the court erred in refusing to sever their trials from that of the Meridas. King and Walker further maintain that the trial court erred in rulings involving extraneous criminal acts. Lilley points to purportedly inconsistent verdicts. And David Merida, King, and

Walker challenge the sufficiency of the evidence.

### ANALYSIS

#### The Search

■ On April 19, 1983 the DEA, possessed of arrest warrants for Dempsey, David, and John Merida as a consequence of their indictment, obtained a federal search warrant for the Merida residence at 5106 Windsong Trail, Houston.[6] The warrant, providing for the search and seizure of documentary and other evidence of a continuing criminal enterprise dealing in controlled substances, was based largely on the indictment which charged, *inter alia,* that Dempsey Merida was the head of an organization which included the 31 coindictees and others in illegal, drug-related activities. A task force composed of city, county, state and federal law enforcement officers was formed to execute the arrest and search warrants. Surveillance of the Merida residence began at 6:00 p.m. on April 19 and continued until shortly before 5:00 a.m. on April 20 at which time the task force met for final instructions.

During the early morning briefing, the officers were informed of the search and arrest warrants. They were cautioned that the Meridas were believed to be armed and dangerous. They were warned that Dempsey and David Merida had been involved in serious incidents in which firearms had been used. All three Meridas were believed to be in the residence. The officers were told that the adjacent enclosed garage might be used as living quarters.

At approximately 6:00 a.m. the officers swiftly interdicted and entered the house, kicking in the door and shouting their identities as police officers. DEA Agent Ronnie Noskrent, an experienced officer, was one of the first to enter the house. He saw Dempsey Merida coming from a darkened bedroom but could not see his hands. Noskrent hit the floor and shouted at Merida to put his hands up. Dempsey Merida was

---

**6.** A warrant was also issued for Dempsey Merida's office. The validity of that warrant is not in question; no evidence was discovered upon its execution.

not armed. He was quickly handcuffed and taken into the living room. The officers rapidly swept the residence, gathering up David Merida, four female adults and one child; all were taken into the living room.

John Merida's absence was apparent and the officers began searching to see if he was hiding in the house. During this sweep the officers spotted several guns, some of which were loaded, in Dempsey Merida's bedroom. One gun was found on top of a dresser, along with a wallet and a stack of documents which were on business letterhead. A small table next to the bed held more such papers and an address book. Three cigar boxes, two opened and one closed, were on the floor. The open boxes appeared to contain receipts. The officers also found two ledgers on top of a safe in a closet searched while looking for John Merida.

Continuing in the effort to find and arrest John Merida, agent Noskrent went to the garage and found both doors locked. Believing he heard the sound of something or someone moving, Noskrent kicked a door open. The first thing he saw was a gun on a bed. A quick scan disclosing no one, Noskrent flipped the bed over to see if John Merida was hiding underneath. He was not. Noskrent then focused his attention on a freezer which was large enough to hold two average-sized persons. He placed his hand on the unit and found it to be warm. There were no vibrations to indicate that the unit was running. Having found people hiding in such places in previous searches and arrests, Noskrent pointed his pistol at the freezer and reached over and pushed the door open. John Merida was not there but a box containing nearly 38 pounds of amphetamine was. Noskrent carried the box to the living room. Total elapsed time from initial entry into the residence until Noskrent's return from the garage was less than ten minutes.

At this point the remainder of the task force was called in to complete a systematic execution of the search warrant. John Merida was not in the residence. He was not then or thereafter arrested and remained a fugitive at the time of trial. The search continued for approximately four hours and produced receipts, canceled checks, ledgers, address books, recipes for making amphetamine and methamphetamine, titles to vehicles, guns, and myriad other items, all of which completely filled a van used to transport the seized items to secure storage.

The Meridas moved to suppress all evidence seized on the grounds that the search warrant was invalid. After a hearing, at which only the warrant and underlying affidavit were introduced, the district court found the warrant illegal because of inadequacy of the affidavit. On motion for reconsideration the government offered evidence about the search and argued that even if the search warrant were invalid, some or all of the evidence was admissible under the plain view doctrine.

The trial judge found that the officers "were acting in the good faith belief that their actions were legal." Despite this finding, he declined to apply the good faith exception embraced by this court in *United States v. Williams*, 622 F.2d 830 (5th Cir. 1980) (en banc), *cert. denied*, 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981), and *United States v. Mahoney*, 712 F.2d 956 (5th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 3590, 82 L.Ed.2d 887 (1984), on the grounds that neither *Williams* nor *Mahoney* involved a warrant. The trial judge then painstakingly sifted through the evidence and found that most of the items were admissible under the plain view doctrine. The court suppressed two briefcases and a bag of methamphetamine found under the bed in Dempsey Merida's bedroom and a machine pistol found inside a closed black case.

The trial court's decision to admit some of the evidence under the plain view doctrine is well reasoned and is supported by prior case law. However, we do not address that issue because all of the evidence seized from the house was admissible under the good faith exception. After the trial judge's ruling, and during the penden-

cy of this appeal, the Supreme Court removed any doubt that the good faith exception was applicable to warrant situations. *United States v. Leon,* —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The Court held that

> reliable physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate ... should be admissible in the prosecution's case-in-chief.

—— U.S. at ——, 104 S.Ct. at 3416, 82 L.Ed.2d at 692.

The Court emphasized that the standard of good faith to be applied is essentially objective, observing:

> [i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.... '[A] warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.' Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued.
>
> Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York,* 442 US 319, 60 L Ed 2d 920, 99 S Ct 2319 (1979); in such circumstances, no reasonably well-trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia of probable

cause as to render official belief in its existence entirely unreasonable.' Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

—— U.S. at ——, 104 S.Ct. at 3420–3422, 82 L.Ed.2d at 697–699 (citations and footnotes omitted).

None of the circumstances which the Supreme Court teaches would negate objective good faith are extant in the present case. The facts in the case at bar more resemble the facts in *Leon,* to which the Court found the good faith exception applicable, than any limitation on the good faith excusal from the effects of the exclusionary rule. In *Leon* the district court found that the underlying affidavits contained stale information and an inadequate basis upon which to determine the reliability and credibility of the informants. The court *a quo* found the affidavit insufficient because of an inadequate showing of a nexus between the items sought and the location to be searched. This affidavit/warrant defect is cut of the same juridical cloth as that in *Leon.* Just as the officers in *Leon* were not expected to second-guess the magistrate, neither are the officers here. That is particularly true in the case at bar in light of the fact that the search warrant emanated, at least in part, from a grand jury indictment of which the officers were aware. The trial judge did not err in admitting part of the evidence seized from the Merida residence. All was admissible.

### Jencks and Brady Material

Most of the prosecution witnesses were DEA informants or coindictees testifying pursuant to plea agreements. All had been interviewed by the DEA in the course of its investigation or in preparation for trial. Each of the informant-witnesses had also signed receipts for payments received from the DEA. The Meridas argue that copies of agents' interview reports, known as

DEA 6s, and the signed receipts should have been made available to defense counsel under the legislative mandate contained in the Jencks Act, 18 U.S.C. § 3500, or pursuant to the jurisprudential rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The Jencks Act requires the government to release to the defendant, after a witness's direct examination, any statement of the witness in the government's possession which relates to the subject matter of the witness's testimony. 18 U.S.C. § 3500(b). The Act defines a statement as

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however, taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e).

Counsel invoked the Jencks Act after the direct examination of each government witness, specifically requesting pertinent DEA 6 reports and, where applicable, the receipts signed by informants for any payment received from the DEA. The government countered that the DEA 6s were not statements under the Jencks umbrella and requested an *in camera* examination pursuant to 18 U.S.C. § 3500(e). Following that examination the trial court upheld the government's position as to most of the DEA 6s but ordered the production of portions of some of the reports. All reports were then sealed and made a part of the record for appropriate appellate review. The government also resisted production of the receipts signed by the informants, contending that all relevant information had been furnished in a summary it had filed. After an *in camera* examination of the receipts the trial court agreed with the

government, sealed the receipts and made them part of this record.

■ We have examined the material under seal and find no error in either ruling. *See United States v. Roemer,* 703 F.2d 805 (5th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 341, 78 L.Ed.2d 309 (1983). The court directed the production of all signed statements but excepted the pay vouchers upon a finding that all relevant information contained in the pay vouchers was included in the summary sheets furnished defense counsel. *See Killian v. United States,* 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256, *reh denied,* 368 U.S. 979, 82 S.Ct. 476, 7 L.Ed.2d 441 (1961). We agree with the district court that the summary sheets contain all of the relevant information. The summarization gives the payment date, payment amount, file number of the case to which the payment was related, a general description of the purpose of the payment, and the name of the officer making the payment. This was copied verbatim from the pay vouchers. The only other data on the vouchers is the name of the officer requesting payment and the name of the person witnessing the informant's signature. Those details are not relevant. Defendants received all of the information to which they were entitled. *Killian.*

■ Our examination of the DEA 6 reports satisfies us that none of the sealed reports contain any "substantially verbatim recital of an oral statement." The reports are short, concise, summaries of the witnesses' versions of the facts as recounted to the agents. Summarization and not verbatim recital is manifest. In each instance in which the reports appear to recite substantially what the witness said the trial court carefully ordered disclosure.

Finding that the reports did not contain substantially verbatim recitals does not end our inquiry for such reports may become producible statements if signed or otherwise adopted by the witness. *Goldberg v. United States,* 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976). Nothing in the reports themselves indicate that the witnesses "signed or otherwise adopted" them. In

that instance the burden falls on defense counsel to establish adoption by showing that the witness read the report, or had it read to him, and then noted his approval. *Goldberg; United States v. Cole,* 617 F.2d 151 (5th Cir.1980). This burden was not acquitted. Although counsel began questions along these lines, counsel offered no basis for relevance when the prosecution objected and the court sustained the objection.[7] Counsel did not request a hearing on this issue. The request for the *in camera* inspection obliged only that; it may not be taken as a request for a statement-adoption hearing. *See United States v. Cole; United States v. Fowler,* 608 F.2d 2 (D.C.Cir. 1979).

◼ Finally, the Meridas argue that the reports of witnesses Lon Robbins, Robert Carpenter, Chuck Newlin, and John Hinson should have been released under the *Brady v. Maryland* rubric as impeachment material. Robbins testified that he told the DEA that he met Dempsey Merida in 1980 and found out soon thereafter that he was the boss of an organization. Carpenter testified that he told the DEA that Dempsey Merida had told him about murdering one person and shooting another when he threatened Carpenter to induce him to maintain silence. The reports of Robbins' interviews indicate that Robbins did tell the DEA about learning that Dempsey Merida was the boss of an organization. Carpenter's reports, however, discuss threats generally without specifically mentioning murder and shootings. The court informed defense counsel that the reports did not contain such specific references and that he could pursue the matter of recent fabrication on cross-examination. Counsel opted otherwise.

Absent the specific request concerning Carpenter, we find only general *Brady* requests. Defense counsel subjected these witnesses to extensive and telling cross-examination, bringing before the jury evidence of Carpenter's earlier perjured testimony, Newlin's plea bargain, Hinson's prior record as an amphetamine "cook," and his membership in the Bandido motorcycle gang. We are not persuaded that any *Brady*-mandated material existed. Even assuming it did, defendants have not met their burden of showing that the material would have had a definite impact on the credibility of the witnesses or probably would have resulted in an acquittal. *See United States v. Martino,* 648 F.2d 367 (5th Cir.1981), *cert. denied,* 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982); *Calley v. Callaway,* 519 F.2d 184 (5th Cir.1975) (en banc), *cert. denied sub nom, Calley v. Hoffman,* 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976).

### Cross-Examination

Dempsey Merida contends that the trial judge unduly restricted cross-examination of eight government witnesses on matters affecting their credibility. These witnesses included DEA informants, coconspirators, and government agents. Limitation of the scope and extent of cross-examination is a matter committed to the sound discretion of the trial judge reviewable only for a clear abuse of that discretion. *United States v. Sudderth,* 681 F.2d 990 (5th Cir. 1982). This complaint borders on the frivolous. The record reflects that the trial court allowed exceptional latitude on cross-examination. In fact the cross-examination of witnesses by Dempsey Merida's counsel alone extends over 2,700 transcript pages, more than the entirety of the government's case-in-chief.

◼ Dempsey Merida complains that the trial court erred in disallowing cross-examination of Don Abbajay, heretofore identified as a DEA informant, about an arrest in Ohio in 1969. The arrest, more than 10 years old, did not result in a conviction. This testimony was excludable under Fed.

---

7. We note in passing that the preferable practice would entail a brief examination of the witness to determine whether the interview was recorded, whether the witness had seen and read the report or had had it read to him, and whether the witness had then or later indicated in any manner that the contents were accurate. In such instances the statements would constitute Jencks material.

R.Evid. 608(b) and 609(b). Beyond this negligible exclusion, the trial judge permitted Abbajay to be examined for nearly three days on his prior gambling activities, smuggling cars and cash, picking up "skim money" for Chagra in Las Vegas, attempting to sell guns to PLO terrorists, participation in a counterfeiting scheme, use of aliases, receipt of payment from the DEA, failure to file tax returns, charges pending in Houston, his deal with the government, violation of his probation and, in general, the full range of illegal activities in which he had recently participated. Cast in this light, there was no conceivable prejudice flowing from disallowance of an aged incidence of arrest. The trial judge did not err in this ruling.

Counsel complains of undue restriction of his cross-examination of Lon Robbins, also a DEA informant, concerning his suspected involvement of smuggling in connection with the vessel the AGNES PAULINE, as well as examination as to the identity of the person in the DEA who allegedly advised Robbins that reward money was not taxable, and about a possibly conflicting statement given DEA Agent Matthewson. Robbins was cross-examined for more than a day. The court allowed questions regarding suspicion of smuggling but cabined questions about the AGNES PAULINE after Robbins specifically denied any involvement with that vessel. Counsel examined Robbins extensively about his frequent testifying for the DEA, a prior indictment, theft of a check, forgery of a car title, revocation of his probation, smuggling, the failure to pay his son's funeral expenses, his deal with the DEA for payment and his failure to file income tax returns. The court ruled that the identity of the DEA agent giving the advice about nontaxability of reward money was irrelevant. The trial court did not exceed its discretionary authority. With respect to the alleged inconsistent statement made to agent Matthewson, Merida's counsel did not ask this question at trial. Walker's counsel did. Walker does not raise that issue on appeal. We do not address it.

Merida complains that he was erroneously denied an opportunity to cross-examine Frank Kelly, another DEA informant, about his smuggling activities, including a smuggling conviction over 10 years old, about the rewards received in other cases and what he expected to receive in this case, and about his reluctance to talk to defense counsel before trial. The court allowed questions about smuggling but not about Kelly's piloting of flights smuggling electronic equipment into Mexico. The court exercised its discretion under Fed.R.Evid. 609(b) to prevent questioning about a 1970 conviction and a sentence under the Youth Offender Act for drug smuggling. Defense counsel were permitted to question Kelly about payments received in other cases and about his expectation of a large sum in this case if convictions were secured. The court disallowed repetitive questions about the exact amount of the expected reward. After Kelly explained that he declined to be interviewed by defense counsel before trial because he did not want his testimony twisted, the trial court limited examination which sought to tie that reluctance to Kelly's desire to help ensure a conviction and thus earn a big reward. Under the circumstances this was not an abuse of discretion.

Newlin, the lawyer coconspirator, testified under a plea agreement. Merida complains that cross-examination of Newlin was fatally restricted. We do not agree. The record reflects a valiant attempt to make Newlin the kingpin of the Merida Organization. Newlin was questioned for nearly a day about the money he made in the organization, his discussions with codefendants and his urging them to testify, his plea agreement with the government, his failure to file tax returns, the possibility of forfeiture of his expensive home and Mercedes, and lawsuits pending against him. The court disallowed a question about an extrinsic act excludable under Fed.R.Evid. 608(b) and proscribed repetitive questioning about the value of his expertise. The court committed no error in so ruling.

■ Dempsey Merida also complains that he was not permitted to cross-examine Robert Brandon, one of his pilots and a coconspirator, about whether he thought a Tennessee grand jury was trying to indict him for the load of marihuana he flew from Belize to Tennessee. Brandon testified that he had been given immunity in consideration for his testimony and that the grand jury was investigating other crimes. Brandon conceded that he was cooperating with the government with the hope that his 20-year sentence would be reduced. The jury had before it the evidence, including his tenuous position, his hope, and his "deal" with the government. The court's reining-in was within its discretion.

■ Finally, Merida complains about cross-examination limitations on three government agents, Noskrent, Braziel and Matthewson. In his examination of Noskrent and Braziel, counsel sought to explore anew matters which had been covered in the suppression hearing. The court correctly restrained this unnecessary duplication. As to agent Matthewson, Dempsey Merida's counsel declined cross-examination when the government offered Matthewson's testimony. Nor were any questions asked when Walker's attorney later called the agent to testify. This asserted error is frivolous.

### Severance

Defendants Walker, Lilley and King contend that the trial court erred in denying their motion for severance pursuant to Fed. R.Crim.P. 8(b) and 14. Each claims that joinder under Rule 8(b) was improper because the offenses did not arise out of the same series of transactions. Each further claims that the joinder caused undue prejudice, eschewed by Rule 14, which resulted in a conviction based upon guilt by association. These defendants point out that most of the evidence in the eight-week trial was unrelated to them.

Joinder Under Rule 8(b).

■ Propriety of joinder under 8(b) is judged from the face of the indictment, accepting all allegations as true. *United*

*States v. Grassi*, 616 F.2d 1295 (5th Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980). Count 1 of the indictment alleges the existence of a continuing criminal enterprise in which Dempsey Merida held a managerial position. The indictment alleges that all of the violations alleged in Counts 4 through 13 and Counts 16 through 20 were part of the same continuing series of violations organized by Dempsey Merida. Walker was charged in Counts 4, 5 and 6 with conspiracy involving amphetamine and methamphetamine. Lilley was charged in Counts 7, 8, 19 and 20 with conspiracy and substantive violations involving cocaine. King was charged in Counts 7, 8, 9 and 10 with conspiracy involving cocaine and heroin. David Merida was charged in Counts 4, 5, 6, 11 and 12 with conspiracy involving amphetamine, methamphetamine and marihuana. The indictment alleges that Walker, Lilley and King were members, along with David Merida, of a continuing criminal enterprise run by Dempsey Merida. The fact that each count does not name all defendants and that different combinations of conspirators participated in different transactions concerning different types of controlled substances does not prevent all of the transactions from being part of the same series of transactions for purposes of joinder. As we observed in *United States v. Grassi*, 616 F.2d at 1303:

> It is not crucial to the existence of a conspiracy that each conspirator participate in every phase of the criminal venture. Nor is it necessary for each conspirator to have knowledge of the identity and role of each of his coconspirators. The unity essential to a conspiracy is derived from the assent of its members to contribute to a common enterprise. Seemingly independent transactions may be revealed as parts of a single conspiracy by their place in a pattern of regularized activity involving a significant continuity of membership. (Citations omitted.)

The organization in this case is similar to, although admittedly more complex and

wide-ranging than, the organizations at issue in *United States v. Perez*, 489 F.2d 51 (5th Cir.1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974), and *United States v. Phillips*, 664 F.2d 971 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). In *United States v. Perez*, two brothers and a friend concocted a scheme to defraud insurance companies by staging automobile accidents and providing medical evidence of faked injuries. Each accident required a driver of a "hitter" vehicle, a "driver" for the struck vehicle, sometimes a "rider," doctors, lawyers, and coordinators. To avoid detection, the participants in each accident necessarily varied. For the same reason the locations of the accidents were widespread. The organizers, hitters, drivers, riders, doctors, and lawyers were indicted together. Of the 21 defendants, 12 were tried together. The fact that some of the defendants had never worked with other defendants on an accident, did not know the identity and specific functions of other coconspirators, and had no actual knowledge of some of the other accidents, did not prevent the finding of a single enterprise and proper joinder.

*United States v. Phillips* involved a drug importation organization called the Black Tuna. The managerial members made arrangements for the smuggling of marihuana from Colombia, some by air and some by sea. Participants varied; most were unaware of the identity of the others or the part others played. Only the central characters were aware of the entire operation. Despite the variances in participants and modality of operation, the court found that the acts alleged in the indictment were part of the same series of acts or transactions making joinder proper.

■ As in *Perez* and *Phillips*, joinder was proper in this case. All of the diverse transactions were part of a single criminal enterprise designed to produce illicit profits from the importation, manufacture, and distribution of controlled substances. The organization was a single enterprise directed and controlled by a core managerial team, not unlike a large corporation with several divisions.

Rule 14.

■ Although initial joinder may be proper under Rule 8(b), the matter may so develop as to render unfair the trial of a particular defendant with one or more codefendants. Fed.R.Crim.P. 14 offers relief in that situation. To claim the benefit of Rule 14 a defendant must show compelling prejudice. Denial of a Rule 14 motion will be reversed only upon a showing of abuse of discretion. *United States v. Phillips*.

■ Defendants Walker, Lilley and King attempt to show prejudice by arguing that: (1) only a relatively small part of the evidence presented during the eight-week trial related to them directly, (2) the evidence relevant only to the other defendants created a background of egregious conduct against which the jury must have reacted with revulsion, and (3) the jury necessarily found them guilty by association because of the insubstantiality of the evidence against them.[8] These arguments are not persuasive. Other trials in which severance has been denied have lasted longer and have involved more defendants. *See United States v. Phillips* (6 months and 12 defendants); *United States v. Martino* (3 months and 20 defendants); *United States v. Kopituk*, 690 F.2d 1289 (11th Cir.1982) (7 months and 12 defendants). Nor is a quantitative disparity in the evidence sufficient to show prejudice. *United States v. Harrelson*, 754 F.2d 1153 (5th Cir.1985). The test for severance under Rule 14 is whether the jury could sort out the evidence reasonably and view each defendant and the evidence relating to that defendant separately. If cautionary instructions are deemed sufficient, severance is not required. *United States v. Phillips*. At the outset of the trial, and in its final instruc-

---

**8.** Lilley does not raise the adequacy of evidence argument. The evidence against Walker and King is discussed *infra*.

**1220**

tions, the court charged the jury not to use evidence relevant to one defendant against another, cautioning against finding guilt by association. During the trial, the judge gave over 40 limiting instructions admonishing against the use of evidence relating to one defendant against other defendants. At trial's end it appears manifest that the jury carefully sifted the evidence, convicting Walker, Lilley and King on two counts each and acquitting Lilley and King on two counts. Against this background and under these circumstances, we find no abuse of discretion in the denial of severance.

### Inconsistent Verdicts

 The jury convicted Lilley of conspiracy to possess cocaine with the intent to distribute and of the substantive offense of possession of cocaine with the intent to distribute. The jury acquitted Lilley of charges that he conspired to import cocaine and imported cocaine. Lilley maintains that these verdicts are fatally inconsistent. He bases his claim on the fact that Abbajay testified that cocaine was sent to Lilley in Houston and that Lilley knew the cocaine had come from Mexico. We are not persuaded. First, a jury may choose to believe part of what a witness says without believing all of that witness's testimony. Second, it is possible to possess cocaine without participating in its importation. *See United States v. Berick*, 710 F.2d 1035 (5th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 286, 78 L.Ed.2d 263 (1983). Finally, even if the verdicts were inconsistent, such would not be fatal. Juries are free to return inconsistent verdicts, for whatever reason, provided their convictions are supported by adequate evidence. *See United States v. Powell*, —— U.S. ——, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932); *United States v. Price*, 750 F.2d 363 (5th Cir.1985).

### Evidence of Extraneous Criminal Acts
a. Walker

Prior to trial the judge ordered the government to approach the bench before offering any testimony concerning extraneous offenses. While Robbins was being cross-examined, the following exchange occurred between Walker's counsel and Robbins:

Q: This is after the time that he has told people that you were working for the DEA?

A: Yes, sir.

\* \* \* \* \* \*

Q: But you say somehow you were able to get Tim Walker back into your confidence?

A: I think that it had already been done for me.

Q: Well, but somehow he trusted you didn't he, sir? According to your testimony?

A: Well, he excuse me—he trusted me enough that he asked me to kill Mr. Steele.

At this point counsel for Walker moved for a mistrial on the grounds that the answer was unresponsive and had introduced impermissible extrinsic evidence. The court found the answer not totally unresponsive and refused a mistrial but offered to instruct the jury to disregard it. Walker's attorney declined the instruction and decided to pursue the matter extensively. He now argues that Walker is entitled to a new trial because the trial judge refused to grant a mistrial.

 A denial of a motion for mistrial will be reversed only if shown to be an abuse of discretion. *United States v. Baldwin*, 644 F.2d 381 (5th Cir.1981). To establish an abuse of discretion a defendant must show that the improper material viewed in the context of the whole trial was so prejudicial that it had a substantial impact on the verdict. *United States v. Robin*, 693 F.2d 376 (5th Cir.1982). The incident in this case is akin to the incident in *United States v. Witt*, 618 F.2d 283 (5th Cir.), *cert. denied*, 449 U.S. 882, 101 S.Ct. 234, 66 L.Ed.2d 107 (1980), in which we upheld the denial of a motion for mistrial. In *Witt*, defense counsel was cross-exam-

ining a government witness when the following exchange took place:

Q You mentioned that—when was that last time you talked to a prosecutor about the facts of this case?

A It was Friday at approximately 2:00 o'clock. I met the prosecuting attorney.

Q Just last Friday?

A Yes, sir, the new prosecuting attorney.

Q You discussed the whole case?

A No, sir, something concerning me, my life.

Q About your what?

A About the contract.

Defense counsel then moved for a mistrial which the court refused to grant. The court offered a limiting instruction which defense counsel declined. We observed that the answer was responsive to the question and concluded that counsel could not turn his own misjudgment into grounds for a mistrial. In the case before us, counsel not only provided the witness with the invitation to make the damaging remark, he impressed that remark into the jury's memory, by repeatedly returning to the subject of the killing of Steele more than two dozen times during the remainder of the cross-examination. The court did not err by denying the mistrial and offering a limiting instruction.

b. King

King was charged with conspiracy to import and possess heroin and cocaine with the intent to distribute. He testified that he had never dealt in or used heroin or cocaine and that he had never dealt in stolen goods. On cross-examination the prosecutor questioned King about his employment history and about the source of funds which King used for living expenses from 1973 to 1983. King testified to a series of short jobs including stints with a foreign currency exchange, a gold and jewelry chain, a strategic metals trading company, a paint shop, and an aluminum siding company. Most of the jobs were of short duration, lasting from six weeks to five months. King claimed to have been unemployed for months at a time between 1973 and 1983. When he was asked about the source of funds which he used to support himself while he was unemployed, he claimed to have lived off the sale of assets acquired prior to 1973 while he was an investment banker. Finally, at the end of his cross-examination, King stated that except for the fact that he was an alcoholic, he was a good citizen.

The government chose to impeach King's testimony by calling as a rebuttal witness his former brother-in-law, William O'Neal. O'Neal testified to several incidents which suggested that King had other illegitimate sources of income between 1973 and 1983 which he did not reveal on cross-examination. O'Neal described one incident where King bought candelabras and silverware from two men who said they had stolen the items. O'Neal also described an episode of King buying stolen jewelry from a woman and then stealing back the money given in payment. The gold exchange dealt in various types of collector's items and O'Neal testified that King had discussed a scheme for dealing in bogus Krugerrands. Finally, O'Neal testified that King possessed cocaine, sold some to him and told him that he could obtain any type of illicit drug.

King objected to O'Neal's testimony as extrinsic evidence of prior bad acts admitted in violation of Rules 404 and 608(b) of the Federal Rules of Evidence. Since King was charged with conspiracy to possess cocaine and heroin with the intent to distribute, the evidence concerning his possession of cocaine after visits from particular people, his sales of cocaine to O'Neal, and his offer to obtain other drugs for O'Neal was evidence of the offense charged and not evidence of extraneous offenses. As such, the testimony did not contravene either Rule 404 or 608(b). The indictment also alleged that King participated in the financing of cocaine and heroin transactions for the Merida Organization and that some of the transactions involved exchanges of stolen property. O'Neal's contradiction of King's statement that all

**1222**

of his funds between 1973 and 1983 were received from legitimate sources was neither extraneous nor pertinent only to collateral matters. The evidence was relevant and material and its admission was not error. *See United States v. Mortazavi*, 702 F.2d 526 (5th Cir.1983).

■ Assuming arguendo that the admission of O'Neal's testimony concerning stolen property and the bogus Krugerrand scheme was error, such would not be reversible because of the overwhelming evidence of King's guilt. The error, if any, would be harmless. *See United States v. Mortazavi*. This leads to consideration of the final assignment of error challenging the sufficiency of the evidence by King, Walker, and David Merida.

### Sufficiency of the Evidence

When the sufficiency of the evidence is challenged, the reviewing court must view the evidence in the light most favorable to the verdict, drawing all reasonable inferences and making all credibility choices which support it. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Mortazavi*. If under these conditions a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the court must affirm. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Brown*, 699 F.2d 704 (5th Cir.1983).

a. King

■ King was convicted of conspiracies to possess cocaine and heroin with the intent to distribute. Abbajay testified that King claimed to have gotten a portion of the cocaine imported by the organization in October of 1980 but that his customers had complained about its poor quality. In May of 1981, the organization received a five-kilo shipment of heroin. Abbajay testified that one kilo of this heroin was set aside for King who had arranged a deal in Austin and that King came in while the shipment was being divided. Abbajay also testified that he witnessed King delivering a small box containing "coke and speed"

from Lilley to Montgomery. King's brother-in-law, O'Neal, testified that King possessed cocaine on several occasions after visits from Montgomery and that King sold cocaine to him. This evidence, if believed by the jury, abundantly supports King's convictions.

b. Walker

■ Walker was convicted of conspiracy to manufacture and distribute amphetamine and methamphetamine. Walker first argues that the evidence varied from the indictment because the government only offered proof concerning methamphetamine. Walker misperceives the law. When an indictment charges two separate offenses in the conjunctive the government need only prove one of the offenses to obtain a conviction. *Turner v. United States*, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970); *United States v. Rubio-Gonzalez*, 674 F.2d 1067 (5th Cir.1982). This the government did.

■ Walker next challenges the sufficiency of the evidence. A review of the evidence reflects that DEA informant Robbins testified that in March of 1981 Walker told him that he had a pharmacist in Atlanta with a quick, inexpensive method of making methamphetamine from ephedrine. At that time Robbins sold Walker a large quantity of ephedrine to be used to make methamphetamine. When Robbins tried a few weeks later to sell Walker more ephedrine, Walker allowed as how he had been unable to make any "speed" because of problems with the pharmacist. At the same time, Walker told Robbins that everything was ready and when he got the product he could sell ten ounces of speed a week. Several of these conversations between Robbins and Walker were taped. At trial Walker admitted receiving ephedrine from Robbins and conceded that he delivered it to Ormand Mayer, a coindictee, for the manufacture of methamphetamine. He also admitted that he had been told that the ephedrine was for making speed and that he had told Robbins that he could distribute ten ounces of speed a week. A reason-

able trier of fact was entitled to conclude that Walker had conspired to manufacture and distribute methamphetamine and that the evidence established his guilt beyond a reasonable doubt.

c. David Lee Merida

■ David Merida was convicted of conspiracy to manufacture, distribute and possess with the intent to distribute amphetamine and methamphetamine. He was also convicted of conspiracy to import marihuana and conspiracy to possess marihuana with the intent to distribute.

Carpenter testified that in August of 1980 he met with Dempsey Merida, David Merida, and another person and that the elder Merida instructed them to rent a truck to transport a load of chemicals from Carpenter's garage to Dunn's amphetamine laboratory. David Merida went with Carpenter to rent the truck and to pay the rental. On another occasion, Carpenter testified that he told Dempsey Merida that he did not have enough money to buy certain chemicals and that Dempsey Merida told him to meet David Merida at a gas station. Carpenter met David Merida at the gas station and was given $3,200 to pay for the chemicals.

David Merida was later arrested for a different offense and met John Hinson[9] in jail. Hinson testified that David Merida discussed plans with him to go to Central America and "cook speed" for David's father's organization. Hinson recounted David Merida's assertion that they would have no problem moving 50 pounds of speed every two weeks. Hinson testified that David Merida told him about his father's lab at the Dunn ranch and that it had been raided by the DEA. Hinson further testified that David Merida claimed that the Dunn lab had produced over 100 pounds of speed before it was busted. Hinson recounted how David Merida spoke to his father and arranged to have marihuana smuggled into the jail in cigarette packs.

Newlin testified about a discussion between David and John Merida about moving the glassware for an amphetamine laboratory. Newlin also testified that David Merida had told him about amphetamine production from a laboratory in Louisiana owned by the organization. Newlin further spoke of David Merida's participation in the conspiracies to import and distribute marihuana. He spoke to the occasion when several members of the organization, including David Merida, awaited the aborted air-drop in a secluded pasture on a ranch near El Campo, Texas. Newlin further testified that David Merida had delivered 30 pounds of marihuana to one Anthony Carrington. A reasonable trier of fact was entitled to conclude that David Merida was guilty of the offenses charged beyond a reasonable doubt.

## CONCLUSION

Our review of the voluminous record consisting of 41 volumes of testimony, nine volumes of pleadings, and 12 boxes of exhibits, plus the exhibits under seal, convinces us that the very able trial judge did a masterful job of managing and presiding over a complex and difficult case. Other than the evidentiary issue made clear by the intervening decision of the Supreme Court in the *Leon* case, no factual finding was erroneous, no ruling was in error, and no abuse of discretion was demonstrated.

All convictions are AFFIRMED.

**9.** Hinson testified pursuant to a grant of immunity and agreement with the government.