**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**James D. BARESH,**
**Defendant-Appellant.**

No. 85–2160.

United States Court of Appeals,
Fifth Circuit.

May 22, 1986.

Before RANDALL and GARWOOD, Circuit Judges, and SCHWARTZ[*], District Judge.

CHARLES SCHWARTZ, Jr., District Judge.

Appellant James Baresh was charged with various narcotics laws violations, in nineteen counts (counts two through twenty) of a twenty-two count indictment. Also indicted with Baresh were five co-defendants, Jorge Ubeda, Giraldo Alvarez, William Satterwhite, Jorge Vasquez and Ben Snyder. Prior to trial, co-defendant Alvarez was allowed to plead to one count of the indictment, and co-defendant Ubeda became a fugitive and was not present for the trial. At the close of the Government's case in chief, co-defendant William Satterwhite was granted a mistrial and eleven counts of the indictment[1] were dismissed as to Baresh.

Trial continued as to Appellant Baresh and the two remaining co-defendants. The jury acquitted the co-defendants but convicted Baresh of conspiracy to possess with intent to distribute marijuana; conspiracy to possess with intent to distribute in excess of 1,000 pounds of marijuana; conspiracy to import marijuana; possession with intent to distribute marijuana; three counts of possession with intent to distribute in excess of 1,000 pounds of marijuana; and importation of marijuana, all in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(6), 846, 952, 960 and 963 and 18 U.S.C. § 2. See Rec. Vol. 1, p. 68, Doc. No. 207 (Jury verdict). From such convictions Baresh appeals.

The evidence at trial tended to establish that beginning sometime in 1979, Jorge Ubeda was engaged in an extensive marijuana importation and distribution scheme. He expanded his operation from small scale distribution to importing boat loads of mar-

Roberto J. Yzaguirre, McAllen, Tex., for defendant-appellant.

Henry K. Oncken, U.S. Atty., Susan L. Yarbrough, James R. Gough, Asst. U.S. Attys., Houston, Tex., Mervyn Hamburg, Atty., Appellate Section, Criminal Div., U.S. Dept. of Justice, Thomas E. Booth, Atty., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

1. Counts five, six, ten, twelve through sixteen, eighteen, nineteen and twenty were dismissed as to Baresh. See Rec. Vol. 1, p. 143, Doc. No. 166 & p. 131, Doc. No. 182; Trial Transcript Vol. XI (October 23, 1984), p. 1447, Doc. No. 271.

ijuana on large ships from Colombia. These loads would be transshipped onto smaller boats off the Coast of Mexico and on carried to Houston, Texas. To facilitate operations, Ubeda rented warehouses through his cohorts and bought a seafood establishment, Captain Wick's, with docking facilities to serve as a front for unloading marijuana shipments. Ubeda was also involved in the insulation business and worked for B & S Insulation, a company owned by Appellant Baresh (also known as "Possum"). Ubeda eventually acquired his own insulation business, U.S. Cellulose, which he sold just prior to purchasing Captain Wick's. When law enforcement officers caused Captain Wick's to close, Ubeda returned to work for Baresh.

Ubeda employed co-defendant Jorge Vasquez in connection with his marijuana importing business and, when he purchased Captain Wick's, made him his manager to handle the loading and unloading of marijuana. Caesar Quiroga was employed to provide a crew of workmen for transporting marijuana from the dock to Ubeda's various warehouses, as were certain truck drivers, including Larry Smith, who allowed Ubeda to use a warehouse Smith controlled and from which the Government seized several tons of marijuana.

Early in 1979, Ubeda also recruited Kevin Ward to distribute marijuana for him. Ward sold marijuana regularly to local drug dealers, including Lee Lane and John Hansen. Beginning in spring 1979 and the following months, Ward and Ubeda travelled to Florida about six times to acquire marijuana and thereafter transported the newly purchased marijuana back to Houston in the trunk of their car and stored it at Ward's apartment at the conclusion of the trips.

Baresh's B & S Insulation Company maintained several warehouses in the Houston area. In 1979, upon Ubeda's instructions, Ward delivered between 200 and 250 pounds of marijuana to Baresh's warehouse on Ashcroft Street. When Ward arrived at the warehouse, he was admitted by Nancy Best, Baresh's secretary, since Baresh was not present. Ward unloaded the marijuana against a back wall of the warehouse and covered it with insulation material. Ubeda had told Ward's wife that as long as he "had B & S Insulation, he had a place to store [marijuana]," although by October 1979, Ubeda asked Ward to rent some additional warehouses because he was dissatisfied with the small sizes of existing warehouses.

In January 1980, Ubeda hired Alan (Jones) Williams and Ben Snyder to bring in marijuana from Mexico. On January 4–5, 1980, Williams, Snyder and four crewmembers left from Captain Wick's on the DIXIE DANDY and a few days later obtained marijuana from a Colombian ship at the Alcaran Reef near Cancun and Campeche, Mexico. When the DIXIE DANDY returned to Captain Wick's, Ubeda met and paid the crew.

In February 1980, Ward leased a warehouse on Pinemont Road in Houston and one week later assisted offloading a boat load of marijuana at Captain Wick's and transferring it to the warehouse. The following day Ward saw this estimated "thousands of pounds" of marijuana at the warehouse. Ubeda told Ward that the marijuana came from Colombia.

Also in early 1980, Ricky Black, a Houston drug dealer, delivered fifty pounds of marijuana to Lee Lane, another Houston drug dealer, who had purchased drugs from Ward. At Lane's direction, Black and Lane then took the marijuana to Baresh's Jasmine Street warehouse in the Bellaire area of Houston. There, Baresh met Lane and Black, and at his instruction, Lane and Black unloaded the marijuana and covered it with insulation. Black returned to Baresh's warehouse in April 1980, purchased directly from Baresh 100 pounds of Colombian marijuana in two bales at $310.00 per pound, and loaded the marijuana into the trunk of his car, with Baresh's assistance. Black made several more purchases of marijuana from Baresh's warehouse between April 1980 and March 1981, on which occasions Black drove his car to Baresh's warehouse, negotiated a price and thereafter

loaded his car with marijuana stored in Baresh's warehouse. On some occasions, Black paid Baresh money and on others he exchanged about 100 pounds of his domestic marijuana for 35 to 45 pounds of Baresh's Colombian marijuana.

Sometime before June 1980, Ubeda directed Ward to obtain marijuana from Baresh's Jasmine Street warehouse, and when Ward arrived there, Baresh personally showed him where the marijuana was stored. About a month and a half later, Ward and Lane went by car to Baresh's warehouse and obtained about two bales of marijuana there hidden in some storage racks. However, Ward did not see Baresh at the warehouse on this occasion.

In late summer or early fall 1980, Ward attempted to purchase about 500 pounds of marijuana from Baresh at his warehouse. During their discussion, Baresh told Ward that he, Baresh, could obtain the marijuana as his last drug deal involved over 3,000 pounds of marijuana. When Baresh opened the doors to the warehouse, they saw a third person and this terminated the proposed transaction. Baresh asked Ward to leave.

In fall 1980, Ubeda recruited Larry Smith to assist transporting marijuana to various warehouses, and Smith ultimately participated in several marijuana deals of approximately 30,000 pounds each. Thus, in early December 1980, Smith leased a warehouse to store marijuana, and sometime after December 2, 1980, Smith transported marijuana from Captain Wick's to this warehouse. On the day following this delivery, he returned to the warehouse, where he saw several people weighing bales of marijuana on another truck. Sometime in the next three weeks, Ubeda compensated Smith for his delivery services by sending him to Baresh's warehouse to receive a bale of marijuana. Smith was met there by Baresh, who took a bale of marijuana from a red seafood truck in the back of the warehouse and gave it to Smith, who in turn placed it in his car and left the premises.

Around December 22, 1980, Ubeda asked Smith to drive another truckload of marijuana from Captain Wick's to a warehouse. On this occasion, Smith, Ubeda, and Ubeda's brother Domingo met at Baresh's Jasmine Street warehouse before leaving for Captain Wick's to offload the marijuana and transport it in Ubeda's truck back to Baresh's warehouse. The following day, Smith returned to Baresh's warehouse and was told by him that the marijuana in question weighed about 30,000 pounds and that Baresh did not want it stored at his warehouse because he did not want "his father or anybody" to discover it there. That evening, Ubeda, his brother and two Cubans moved the marijuana from Baresh's warehouse to another warehouse on Old Beaumont Highway.

In early 1981, Smith helped Ubeda transport marijuana off-loaded from a boat at Captain Wick's to another Ubeda warehouse at 3801 Trail Mobile near the Old Beaumont Highway.

In February 1981, Williams and Snyder obtained marijuana for Ubeda from a boat located off the coast of Galveston. In March 1981, Black purchased between 50 and 100 pounds of Colombian marijuana at $290.00 per pound from Baresh at Baresh's warehouse. When Black first appeared at Baresh's warehouse, Baresh asked Black whether Black had the money, and when he replied that he did, Baresh opened the door to the warehouse and allowed Black to load several bales of marijuana into Black's car. The bales of marijuana were wrapped in foreign newspapers. On March 20–21, 1981, DEA Agents investigating an unrelated group of marijuana conspirators arrested Smith at one of the warehouses. Smith subsequently agreed to cooperate with the authorities and his cooperation led to the investigation of Ubeda and Baresh.

Some of Baresh's social and business associates testified that he was peaceful and law abiding and other business associates testified they visited his warehouses in the course of business and had free access thereto but never saw any marijuana.

William Satterwhite, an attorney, was indicted as a co-conspirator. The case against him rested primarily on the testimony of Caesar Quiroga, a cooperating Government witness. The nature of Quiroga's plea agreement with the Government, revealed by his cross examination, rendered his testimony inadmissible, and a mistrial was granted as to defendant Satterwhite. During the course of Quiroga's testimony, he implicated defendant Baresh in relatively brief testimony as set out in Appendix A to this Opinion. The trial judge, when declaring a mistrial as to Satterwhite, advised the jury to disregard and strike from the context of the case Quiroga's testimony as to any other defendant.[2]

The trial of this case began with jury selection on September 10, 1984 and concluded with the jury's verdict of October 29, 1984. Evidence was taken on eight days, during which Quiroga testified on direct examination on October 8, 1984 and on cross examination on October 10, 1984. See Trial Transcript Vol. VII, Doc. No. 267; Trial Transcript Vol. IX, Doc. No. 269. The transcript of trial testimony is composed of approximately 2000 pages and Quiroga's testimony involved approximately 330 pages.

## Assignments of Error

Baresh's appeal rests on several grounds. He complains of the trial court's failure to grant his motions for mistrial and new trial based on the asserted prejudicial effect of the stricken Quiroga testimony; restrictions placed upon his cross examination of Kevin Ward; and the citation of defense counsel for contempt and imposition of a fine in the presence of the jury.

Baresh also challenges the trial court's refusal to grant a judgment of acquittal on several counts of the indictment due to insufficient evidence. The specific counts in question allege Baresh's aiding and abetting the possession with intent to distribute in excess of 1,000 pounds of marijuana on November 20, 1980 (count eight), December 22, 1980 (count nine) and March 16, 1981 (count eleven). The other challenged counts allege Baresh conspired to import marijuana from October 1, 1979 until time of filing the indictment (count four) and aided and abetted importing marijuana

---

2. The Court stated:

All right. We are going to continue with the trial of this case this morning, jurors. Let me explain some developments that have occurred since we last gathered. First of all, I have granted a mistrial to Mr. Satterwhite, one of the defendants in the case. The meaning of that is that he will be retried at a later date. And the reason for the mistrial, among others, is that the Government—one of the principal witnesses against him obviously was Mr. Quiroga, the witness who testified before you. I have reviewed the background of a plea arrangement that Mr. Quiroga made with the Harris County District Attorney's Office originally, and which was subsequently, and in substance, later adopted by the federal Government. And because of the—without going into great details about the plea arrangement, but because of the plea arrangement that was made, his testimony was inadmissible in this case. And to compound matters, you know, in reviewing a statement that he made—that Quiroga made earlier to the District Attorney which contained at least one falsehood, and his testimony here, jurors, that he did not know these people that he had contacted in Florida and whom he testified he

worked with and were his crew, he didn't know any of their names, I simply did not deem him credible where anybody could predicate a conviction in his testimony. So, I'm instructing you that under the law—but even if his testimony were all true, it would not be admissible in light of the law because of the plea arrangement that the, one of the Assistant District Attorneys made with Mr. Quiroga when he was in state custody and under state charges. In light of that testimony, plus some other matters that occurred during the trial, I granted Mr. Satterwhite's motion for a mistrial. So, he's no longer a defendant in the case. But the remaining defendants, Mr. Baresh, Mr. Snyder, and Mr. Vasquez, of course, are still in this, and this trial will proceed as to those three defendants. But, of course, my ruling applies to all of Mr. Quiroga's testimony, because some of his testimony implicated others of the defendants and also spoke of the conspiracies. So you are to disregard all of his testimony the same as if you had never heard it, for the reasons I have already stated.

Trial Transcript Vol. XII (October 25, 1984), pp. 1475–76, Doc. No. 272.

from Colombia on December 22, 1980 (count seventeen).[3]

Lastly, Baresh raises certain contentions affecting his sentencing. First, he challenges the trial court's failure to merge count three, charging Baresh with conspiring from September 26, 1980 to the time of his indictment to possess with intent to distribute marijuana in excess of 1,000 pounds, into count two of the indictment, charging Baresh with conspiring from April 1, 1979 to September 25, 1980 to possess marijuana with intent to distribute it. This assignment of error is based upon the trial court's utilization of increased penalties available for the violations charged in count three, which penalties came into effect on September 26, 1980. Rather, defendant contends his sentencing should be limited by the lesser penalties applicable to count two, because assessment of penalties pursuant to the September 26, 1980 amendment violates the ex post facto clause of the Constitution. Secondly, Baresh complains of his sentencing under counts eight, nine and eleven because such counts are multiplicitous and violate the double jeopardy clause.

### The Sufficiency of the Evidence [4]

■ In a case such as this, where defendant was charged with aiding and abetting narcotics possession, the Government need only show that the defendant somehow aided and abetted the principal's possession of marijuana, and it is not necessary to prove that the defendant had actual or constructive possession of the narcotics in question or that he was physically present when the drugs were distributed. *See United States v. Pozos,* 697 F.2d 1238, 1242 (5th Cir.1983); *United States v. Fischel,* 686 F.2d 1082, 1087 (5th Cir.1982).

■ For example, there was evidence that Baresh possessed marijuana with intent to deliver it on December 2, 1980.[5] Testimony indicated Smith helped unload about thirty pounds of marijuana for Ubeda from a boat at Captain Wick's around December 2, 1980 and at Ubeda's direction received directly from Baresh at Baresh's warehouse a bale of marijuana as payment for services. Thus, by paying Smith for his participation in the 30,000 pounds importation operation, Baresh clearly aided and abetted possession of the marijuana.

■ There was also evidence that on December 22, Smith went to Captain Wick's from Baresh's warehouse to observe marijuana being unloaded from a ship. According to Smith's testimony, this marijuana was then taken by truck to Baresh's warehouse, whereupon Baresh told Smith the unloaded trailer contained 30,000 pounds of marijuana. That evening, Smith, Ubeda and others transported this load of marijuana from Baresh's warehouse to a warehouse containing a previous load. Thus, there was sufficient evidence from which the jury might properly conclude that Baresh actually possessed the marijuana for about one day before Smith and others transported it to another warehouse.

■ Baresh further contends that only 50 to 100 pounds of marijuana were sold to Black on March 16, 1981 and thus his conviction for aiding and abetting possession of 1,000 pounds of marijuana on that date must be set aside. However, the evidence need only show that Baresh assisted Ubeda in possessing over 1,000 pounds of marijuana, and again, there was ample evidence from which the jury might conclude that Ubeda possessed over 1,000 pounds near that date, in light of Williams' testimony that a boat load of marijuana[6] was deliv-

---

**3.** Appellant does not challenge the sufficiency of evidence as to counts two, three and seven.

**4.** This section addresses assignments of error six and nine.

**5.** The indictment alleged that events charged in count eight occurred on or about November 20. However, the evidence does not vary materially

from the allegations of the indictment. *See United States v. King,* 703 F.2d 119, 123–24 (5th Cir.), *cert. denied,* 464 U.S. 837, 845, 104 S.Ct. 127, 148, 78 L.Ed.2d 123, 138 (1983).

**6.** Trial evidence was also offered to establish that a boat load of marijuana consisted of 300 to 400 bales and that a bale of marijuana weighed thirty to sixty pounds.

ered to Captain Wick's. Moreover, Black's testimony regarding his trading domestic marijuana with Baresh for Colombian marijuana, as well as other testimony concerning the relationship between Ubeda and Baresh, could properly cause the jury to infer that Baresh sold some of the marijuana Williams had acquired for Ubeda on that date and, thus, helped Ubeda to possess it.

■ The Court concludes the evidence was sufficient to support Baresh's conviction of conspiring to import marijuana into the United States from October 1, 1979 until the time of indictment (count four) and aiding and abetting Ubeda and others in importing marijuana from Colombia on December 22, 1980 (count seventeen). The evidence showed that each load of marijuana offloaded at Captain Wick's was substantial. The jury could have fairly inferred that the conspirators necessarily had to plan for its transportation and storage in advance of each shipment. Taking into consideration Baresh's relationship with Ubeda, along with his willingness to store imported marijuana at his warehouses and to pay Smith with a bale of marijuana for his services as an unloader, there was sufficient evidence from which the jury could conclude that Baresh was a conspirator in the plan for the importation and offloading of marijuana.

■ Baresh contends that the evidence at most established that he possessed but did not import marijuana on December 22. However, there was ample evidence that Ubeda hired boat captains to obtain marijuana from Colombian ships off the Mexican coast and that such marijuana was unloaded at Captain Wick's and transported to Baresh's warehouse. The jury could conclude that Baresh knew the marijuana was imported because packaging marijuana

in bales is a common method of packaging Colombian marijuana. Moreover, Baresh exchanged marijuana with Black on the understanding that marijuana stored by Baresh was of higher value than Black's domestic marijuana. Thus, even though Baresh did not directly transport the marijuana into this country, he could be properly convicted for assisting in importation of marijuana as an abettor. *See United States v. Gramlich*, 551 F.2d 1359, 1363 (5th Cir.), *cert. denied*, 434 U.S. 866, 98 S.Ct. 201, 54 L.Ed.2d 141 (1977), *United States v. Fischel*, 686 F.2d 1082 (5th Cir. 1982).

### The Court's Limited Restriction on Appellant's Cross Examination of Kevin Ward [7]

■ Baresh asserts he was denied his constitutional right to confrontation by the trial court's impermissible restrictions upon cross examination of witness Kevin Ward. In reviewing the district court's limitations of cross examination, this Court is bound to determine whether the trial court imposed unreasonable limits on cross examination such that a reasonable jury might have received a significantly different impression of a witness' credibility had defense counsel pursued his proposed line of cross examination. *See Delaware v. Van Arsdall*, ——— U.S. ———, ———, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986).[8]

■ Baresh's counsel cross examined Ward at length about his arrangement with the Government and his guilty plea in state court. During counsel's extensive cross examination of Ward on what promises had been made to Ward, Ward volunteered that despite his guilty plea to a state drug charge, he "didn't think he was guilty."

---

**7.** The Court here addresses assignments of error three and five.

**8.** If this burden is met by the appellant, the reviewing court must then assess whether the error was harmless. We need not reach the harmless error inquiry in light of our finding that Ward's motives and credibility were adequately explored at trial. However, the Court is mindful that even discounting Ward's testimo-

ny, Black and Smith's accounting of how Baresh distributed marijuana to them was sufficient to implicate him in the conspiracy. Moreover, Ward's wife implicated Ubeda and Baresh in the conspiracy because Ubeda told her he stored marijuana at Baresh's warehouse. Thus, Ward's cumulative testimony even as limited discloses no reversible error.

However, the district judge barred inquiry into Ward's reasons for his guilty plea in light of Ward's belief in his innocence, because those details had "no direct bearing on the case." The trial court further precluded inquiry into the federal Government's obligation to Ward concerning Ward's potential loss of probation. However, during Ward's extensive cross examination, testimony was elicited regarding Ward's drug use, his initial efforts to deceive the DEA, his receipt of $11,000.00 from the DEA, his promise of immunity from federal prosecution in exchange for his testimony, and his knowledge of some federal assistance at his upcoming probation revocation hearing. Thus, the record indicates the district court allowed Baresh full and effective cross examination into Ward's motives for testifying. Furthermore, it was not necessary to elicit whether federal agents would inform the state revocation court of Ward's testimony at trial because of Ward's admissions to that effect. Thus, the trial court's limited restriction upon Baresh's counsel's cross examination was not improper. *See Delaware v. Van Arsdall,* — U.S. —, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). *See also United States v. Kimble,* 719 F.2d 1253 (5th Cir. 1983) *cert. denied,* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984); *United States v. Merida,* 765 F.2d 1205, 1216, *reh. denied* 770 F.2d 164 (5th Cir.1985) (Limitations on scope of cross examination reviewable for abuse of discretion).

### The Court's Contempt Citation of Appellant's Attorney In the Jury's Presence

As mentioned earlier, the district court barred trial counsel's [9] attempt to discover why Ward had plead guilty to a drug charge in the state court when he did not believe himself to be guilty. When the attorney persisted, the district court then excused the jury and advised counsel not to cross examine Ward about the reason for his guilty plea. The trial court had earlier advised counsel that his cross examination had been unduly repetitious and advised him that any further violation of the court's order would result in sanctions. The jury returned to the courtroom and when the trial resumed, counsel continued with the same course of inquiry and asked Ward whether Ward's guilty plea occurred under oath. The trial court then stated,

> Counsel, I have ordered you not to go into that. I fine you $500.00. You've got a $500.00 fine for contempt of Court. I told you outside the presence of the jury not to go into that any more. That's $500.00 you owe me. And I am going to double the fine the next time.

This statement constitutes the sole reference to Baresh's counsel's contempt citation. During a later recess in the trial, the trial court denied Baresh's motion for an immediate jury instruction that the contempt citation should not be viewed as a comment on Baresh's case. However, in its final jury instructions, the trial court admonished that the fine levied against Baresh's counsel was not a reflection on Baresh. The trial court further instructed the jury not to consider the court's comments or remarks during trial but to decide the case solely on the evidence.

The transcript of this case reveals that Baresh's counsel was unduly repetitious throughout the trial and seemed bent on thwarting the trial judge's efforts to conduct an expeditious and fair trial. One cannot help but conclude that one of counsel's trial tactics was to bait the trial judge. The judge showed admirable restraint and gave more latitude to counsel's examination of witnesses than one would expect counsel deserved in the context of this case. There were no other serious admonitions. The record further reflects that after this contempt citation, counsel was allowed wide latitude in his examination of witnesses, to the same extent as before the contempt citation, and the trial judge treated counsel politely and admonished him rarely and no more than any other counsel in the eight days of taking evidence, which

---

**9.** Baresh was represented at trial by Mike Ramsey.

as previously mentioned, occupies more than 2000 pages of transcript.

 Unquestionably, admonishments to defense counsel are best made outside the jury's presence. However, a court's contempt citation to a defense attorney in the jury's presence does not automatically constitute error. *See United States v. Abrams,* 568 F.2d 411, 423–25 (5th Cir.1978), *cert. denied,* 437 U.S. 903, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978); *United States v. Candalaria-Gonzalez,* 547 F.2d 291 (5th Cir.1977); *United States v. James,* 510 F.2d 546, 550–51 (5th Cir.), *cert. denied sub nom., Vasquez v. United States,* 423 U.S. 855, 96 S.Ct. 105, 46 L.Ed.2d 81 (1975). Rather, the conduct of the trial as a whole must be scrutinized to determine whether the defendant was fairly and impartially tried. *See United States v. Schrimsher,* 493 F.2d 848 (5th Cir.1974) (Court rejecting defendant's claim of unfair prejudice based upon jurors' knowledge of defense counsel's incarceration for contempt). In this case, the sequence of events outlined above demonstrates that after being advised outside of the presence of the jury not to take a particular course of action, counsel immediately proceeded to contemptuously disregard that order. To that extent, counsel's conduct implies a planned trial tactic to provoke the district judge and leads to the inescapable conclusion that counsel hoped to cause the judge to react in such a manner as to cause error. It would be improper to allow Baresh to benefit from such a calculated trial ploy. *See United States v. Jackson,* 627 F.2d 1198, 1206 & n. 18 (D.C.Cir.1980).

### Refusal to Grant a Mistrial After Striking the Testimony of Quiroga [10]

 Baresh claims he was unfairly prejudiced by the Quiroga testimony ultimately stricken from the record, alleging its length and its implicating Baresh in the marijuana ring. The Government claims, however, that this testimony was cumulative to those of other witnesses and that the jury instructions on disregarding the stricken testimony were thorough. In resolving these issues, this Court must decide whether the refusal to grant a mistrial was an abuse of discretion. *See United States v. Merida,* 765 F.2d 1205, 1220–21, *reh. denied,* 770 F.2d 164 (5th Cir.1985). Reversible error exists if the evidence, when viewed in the context of the whole trial, is so highly prejudicial that it would have had a substantial impact on the jurors' verdict. *United States v. Kimble,* 719 F.2d 1253, 1257 (5th Cir.1983), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984) (Discussing effect of extrinsic offense evidence).

 Ceasar Quiroga testified for part of two days, on October 8 and 10, during which he implicated Baresh to a limited extent.[11] The length of his testimony was due in large measure to Baresh's counsel's cross examination into Quiroga's plea agreements. When cross examination disclosed that Quiroga had entered into several state and federal plea bargain arrangements contingent upon producing information which would result in the indictment of both co-defendants Satterwhite and Ubeda, the trial court granted a defense motion to strike Quiroga's testimony and also granted Satterwhite's motion for a mistrial on grounds there was insufficient independent evidence of Satterwhite's guilt to warrant submission of the case to the jury.[12] However, the trial court refused to grant a mistrial as to Baresh, although the jury was instructed that Quiroga's testimony was inadmissible and "to disregard all of his testimony the same as if you never heard it." Referring to Quiroga's claim that he did not know the identities of some of his fellow unloaders, the trial judge fur-

---

10. The Court here addresses assignments of error one and two.

11. See Appendix A.

12. The U.S. Attorney also dismissed counts five, six, ten, twelve, thirteen, fourteen, fifteen, sixteen, eighteen, nineteen and twenty as to Baresh because the only evidence as to Baresh's guilt under those counts was Quiroga's testimony.

ther stated that no one could predicate a conviction on his testimony, indicating Quiroga was unworthy of belief. These instructions to the jury were careful and thorough and sufficient to dispel any prejudice from the jury's hearing Quiroga's testimony. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 644, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974); *United States v. Perez-Robles*, 718 F.2d 700, 701–02 (5th Cir.1983), *cert. denied*, 465 U.S. 1031, 104 S.Ct. 1297, 79 L.Ed.2d 697 (1984).

Moreover, Quiroga's testimony merely cumulates the testimony of Black, Smith and Ward. For example, evidence concerning the December 22, 1980 importation and possession of marijuana came primarily from Larry Smith. Quiroga never mentioned that Baresh was present during the December 22 offenses.

The substantial independent evidence of Baresh's guilt is best characterized by the following observation of the trial judge when he dismissed the jury after taking the verdict:

> I know you had a very difficult task to perform here in the case against Mr. Baresh was extremely strong. [sic] And I know the case against the other two defendants was not nearly so strong because you had to rely only on the testimony of one or two people to [sic] that you would have to accept in order to find them guilty. Mr. Baresh, on the other hand, there was a very substantial amount of evidence against him and I can—I would certainly be surprised had your verdict been anything other than what it was.

Trial Transcript Vol. XIV, Doc. No. 274, pp. 1980–81.

*Review of Sentencing in Light of the Double Jeopardy and Ex Post Facto Clauses*

Due to the use of concurrent sentencing as to various counts of the indictment, the sentences imposed by the trial court for all counts would result in Baresh's incarceration for a net amount of ten years, payment of a total fine of $40,000 and serving a special parole term of seven years. Specifically, the trial court imposed sentences of five years each under counts two and four, to run consecutively, with additional sentences of five years each imposed as to counts seven, eight, nine and seventeen, all to run concurrently with the sentence imposed as to count two. The trial court further imposed sentences of ten years as to each of counts three and eleven, with those sentences to run concurrently with the sentences imposed under counts two and four. The trial court further ordered Baresh to pay fines of $5,000 for each count, or $40,000, and imposed a total special parole term of seven years under counts seven, nine, eleven and seventeen.[13]

The statutory maximum penalties for the charges in each of counts two, four, seven and seventeen are imprisonment for a term of five years and/or a fine of $15,000. The charges in counts three, eight, nine and eleven each carry maximum penalties of fifteen years imprisonment and/or a fine of $125,000.

■ Baresh first challenges his sentencing on grounds that the three counts of possession of marijuana on December 2, 1980 (count eight), December 22, 1980 (count nine) and March 16, 1981 (count eleven) are duplicative, because the evidence did not establish Baresh's possession of a different supply of marijuana on each date. Thus, Baresh contends that the multiple counts of possession violate the double jeopardy clause and that he could not be separately sentenced under each count.

As should be apparent from the preceding discussions of the evidence, the issue is whether Baresh was properly convicted as an aider and abettor to Ubeda's three separate acts of possession. The evidence was more than sufficient to support a jury find-

---

**13.** See Transcript of Sentencing, Doc. No. 252 (February 5, 1985).

Elsewhere in the lower court's record, the sentencing imposed under counts two and four is stated to be concurrent. However, the briefs of the parties and transcript of proceedings indicate the sentencing under counts two and four is consecutive.

ing that Ubeda possessed three separate loads of marijuana on the dates in question and that the jury could have fairly concluded that appellant aided and abetted the possession of three separate supplies of marijuana. The evidence also supports a finding that Baresh himself possessed marijuana from three separate supplies and was, therefore, not improperly convicted based upon a single continuing possession of marijuana.

■ The double jeopardy clause is limited to insuring that a defendant is not sentenced to more punishment than Congress intended. *See Garrett v. United States,* ⸺ U.S. ⸺, 105 S.Ct. 2407, 2411–12, 85 L.Ed.2d 764 (1985). As to the charges here in question, we conclude that Congress intended punishment for each possession of a controlled substance under 21 U.S.C. § 841. *See United States v. McDonald,* 692 F.2d 376, 378 (5th Cir.1982) *cert. denied,* 460 U.S. 1073, 103 S.Ct. 1531, 75 L.Ed.2d 952 (1983) (Separate deliveries of controlled substances on different days separately punished); *United States v. Davis,* 656 F.2d 153, 159 (5th Cir.1981), *cert. denied,* 456 U.S. 930, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982) (Upholding multiple sentencing for simultaneous possession of different types of drugs). Accordingly, Baresh was properly convicted and sentenced on each count.

Baresh further contends that his sentencing was improper because he was charged with and sentenced under two conspiracy counts for participating in only one conspiracy. Specifically, Baresh was charged and convicted in count two of the indictment for his participation in a conspiracy from April 1, 1979 to September 25, 1980. Count three charged his involvement in a conspiracy beginning September 26, 1980 until issuance of the indictment. The Government conceded at trial that only a single conspiracy existed, but the use of two counts emanates from a statutory revision effective September 26, 1980, increasing the penalty for conspiring to possess marijuana.

The trial court imposed a five year sentence and $5,000 fine as to count two and a ten year sentence and $5,000 fine as to count three under the increased penalty. As stated above, the sentence in count three was ordered to run concurrently with the sentences imposed under counts two and four. However, even if the sentences imposed under counts two and three were aggregated, they would be within the maximum penalties authorized by the revised law. Thus, this Court need only address whether sentencing under the revised law's increased penalties would be proper.

■ The ex post facto clause bars any statute that among other things increases the punishment for a crime after its commission. *See Dobbert v. Florida,* 432 U.S. 282, 292, 97 S.Ct. 2290, 2297, 53 L.Ed.2d 344 (1977); *Thompson v. Blackburn,* 776 F.2d 118 (5th Cir.1985). However, because conspiracy is a continuing crime, a statute increasing the penalty for a conspiracy beginning before the date of enactment but continuing afterwards does not offend the Constitution. *See United States v. Todd,* 735 F.2d 146, 150 (5th Cir. 1984), *cert. denied,* ⸺ U.S. ⸺, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985). Thus, measuring the trial court's sentencing authority by that permissible if count two were merged into count three, the sentencing is proper.

■ In any event, the greater penalties imposed under the revised law do not exceed those imposed for Baresh's convictions under other counts of the indictment affirmed earlier in this opinion, rendering discretionary a review of the sentencing under counts two and three. *See Barnes v. United States,* 412 U.S. 837, 849 & n. 16, 93 S.Ct. 2357, 2364 & n. 16, 37 L.Ed.2d 380 (1973); *United States v. Strickland,* 509 F.2d 273, 274 (5th Cir.1975). In fact, the challenged sentencing could have been properly imposed as to certain of the counts alone. However, the Court acknowledges that in this particular case, the cumulation of offenses and sentencing may have a practical effect upon parole commission determinations. A review of each of

the challenges to defendant's sentencing was therefore appropriate.

For the foregoing reasons, the Court declines to set aside the convictions and sentencing from the trial court below and Baresh's convictions and sentencing are hereby

AFFIRMED.

## APPENDIX A

Defendant Baresh is implicated by the following testimony of Caesar Quiroga: Transcribed in Trial Transcript Vol. VII, October 8, 1984, Court of Appeal Record Vol. 20, Doc. No. 267, p. 857:

Q. Do you know a James Baresh?

A. Possum?

Q. Do you know a man named Possum?

A. Yes, sir.

Q. Do you see this man in the courtroom today?

A. Yes, sir.

[With regard to testimony of a marijuana shipment unloaded in January 1980 at Captain Wick's, testimony at pp. 865–66 is as follows]:

Q. What were you loading the bales into?

A. Into the truck trailer.

. . . . .

Q. After you finished, what happened?

A. We come back to the motel.

Q. Do you know what happened to the marijuana?

A. They went to insulation place. [sic]

Q. All right. Did you go to where the marijuana was?

A. Yes, sir.

Q. And when was that?

A. The next morning.

Q. And why did you go there?

A. I helped to weigh, you know, to weigh the marijuana.

. . . . .

Q. Who put [the number showing the weight] on the paper, if they did?

A. It was two guys over there, I don't know who it was.

Q. And did anybody else do anything with the number?

A. Yes, sir.

Q. What is that?

A. Possum.

Q. What was Possum there doing?

A. They over there—he's over there with the people.

Q. Do you remember the name of the insulation company where you were at?

A. B & S Insulation.

Q. And how long were you there at the insulation company?

A. At that time I was there for about ten days.

[The next testimony concerned the witness' collecting money owed for the above transaction on pp. 867–68]:

A. We came to Houston in about September, October [to collect the rest of the money owed].

The Court:

Of what year?

A. '80, sir.

[By Mr. Young]

Q. And what did you do when you came to Houston?

A. We came, five people, from Miami, and we went to the insulation place.

. . . . .

Q. What insulation place did you go to?

A. B & S.

Q. Was anybody there?

A. Yes.

Q. Who?

A. Possum.

Q. Did you talk to Possum?

A. Yes, sir.

Q. What did you talk about?

A. I'm telling, I say we came here to collect the money from the day we unload the boat.

Q. Did he say anything?

A. He said he haven't [sic] seen Jorge for a few days.

. . . . .

[Then, after indicating he had an opportunity to talk to "Jorge" about the money owed in November, 1980 in Houston, the witness testified in response to the following questions:]

Q. And where did you find Jorge?

A. In the insulation place.

Q. Same place, or a different place?

A. Same place.

[With regard to Mr. Quiroga's attempts to collect money for second and third loads brought in for Ubeda, testimony at pp. 874–75:]

Q. Did you try to get your payment before [May, June ... or July]?

A. Yes, sir.

Q. And how did you try to get it?

A. I came to Houston a few times.

. . . . .

Q. And did you collect any when you came here to Houston?

A. No, sir.

Q. And who did you talk to about trying to get your money?

A. Possum.

Q. What did Possum tell you, if anything?

A. He told me Jorge is outside driving the truck.

Additional testimony appears on p. 888:

Q. Mr. Quiroga, you stated you talked to Mr. Baresh, or the man you called Possum on several occasions at his warehouse?

A. Yes, sir.

Q. Did you discuss the insulation business with him?

A. Yes, sir, the insulation business.

Q. Were you there to buy insulation from him?

A. No, sir.

Q. Are you in the insulation business at all?

A. No, sir.

Q. What were your discussions about with Mr. Baresh?

A. The money Ubeda owed me.

The direct testimony of Quiroga ended at p. 888. Counsel for Baresh waived cross examination at that time and passed until later. *See id.* at p. 893 & pp. 1125–37; Trial Transcript Vol. IX, Doc. No. 269, pp. 1190–1302.

On cross examination, Quiroga testified as follows, with reference to Baresh:

From Trial Transcript Vol. VII, Doc. No. 267, p. 1000:

Q. [W]hen you came over here before five times with various people, did you ever ... find Mr. Ubeda and talk to him about your money?

A. Yes, sir. One time we find insulation place. [sic]

And at p. 1023: [With regard to a May 1980 load],

Q. After the boat was unloaded, you stayed [at a Texas motel] for a few days, is that correct?

A. I stayed there, here, for about ten days.

. . . . .

Q. And I am going to presume you stayed for what reason?

A. I help weigh the stuff in the insulation [sic].

The remaining cross examination and redirect examination focused upon Mr. Quiroga's plea and cooperation agreements with state and federal government.