UNITED STATES of America,
Plaintiff-Appellee,

v.

William Parkman OSGOOD,
Defendant-Appellant.

No. 85–2624.

United States Court of Appeals,
Fifth Circuit.

July 24, 1986.

Rehearing and Rehearing En Banc
Denied Aug. 22, 1986.

Abraham Kazen, III, (court-appointed), Michael E. Tigar, Austin, Tex., for defendant-appellant.

Helen M. Eversberg, U.S. Atty., Michael R. Hardy, U.S. Asst. Atty., Richard R. Durbin, Jr., San Antonio, Tex., for plaintiff-appellee.

Before BROWN, REAVLEY, and JONES, Circuit Judges.

EDITH HOLLAN JONES, Circuit Judge:

William Parkman Osgood appeals his jury conviction of conspiracy to import cocaine,[1] conspiracy to distribute cocaine,[2]

---

1. 21 U.S.C. §§ 952(a) and 963.

2. 21 U.S.C. §§ 841(a)(1) and 846.

and distribution of cocaine,[3] contending that certain evidence was improperly admitted at trial and that there was insufficient evidence to support two of his convictions. Finding none of the assigned errors meritorious, we affirm.

## I. FACTS

Simply stated, this case involved a group of persons who engaged in a conspiracy to import and distribute cocaine from South America. Malte Dollinger, the South American connection, orchestrated the scheme and arranged to procure the cocaine and transport it, concealed inside specially constructed suitcases, into the United States. Appellant William Osgood participated in the conspiracy's delivery aspects and explored with Dollinger and others additional methods of cocaine smuggling. The facts are set out here in the light most favorable to the government. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

Appellant Osgood met Omar Eisenhart in November 1980 at the Miami apartment of Malte Dollinger, a mutual acquaintance with whom Osgood once worked and frequently lived. The preceding summer, Eisenhart had met Dollinger while flying for a small commuter airline in Pennsylvania and agreed to sell cocaine imported by Dollinger from South America. Aided by Ronald Babb and Richard Reifenstahl, Dollinger then delivered kilo-quantities of cocaine to Eisenhart at his residence in Cherry Hill, New Jersey. Eisenhart divided the cocaine among himself, associate Thomas Pavlo, and other Philadelphia-area distributors. The cocaine was packaged in seal-a-meal type plastic bags, sealed in an outer plastic bag containing white pepper and baking soda to mask the odor, and was smuggled into the country concealed within false compartments in specially constructed Samsonite-type suitcases. To support this enterprise, Dollinger frequently encouraged the distributors to "invest" front money for the financing of additional smuggling trips in return for substantially reduced prices. The cocaine-filled suitcases were transported by Dollinger's couriers on commercial flights through various South American countries and then to Kennedy Airport in New York. Dollinger subsequently shifted the point of entry to the Canadian border, however, because customs agents at Kennedy Airport seized one of the suitcases the following February.

In January 1981, Eisenhart and Dollinger discussed obtaining twenty kilos of cocaine in exchange for Eisenhart's private plane. The plan required that Eisenhart deliver his plane to "some guys from Bolivia" in Manaus, Brazil. According to Dollinger, Osgood, a charter pilot with whom Dollinger had worked in 1978, would then transport the cocaine to the United States; he had done it before and had a "system" for importing it. The following May, Eisenhart discussed this transaction with Osgood, and thereby understood that Osgood "was going to be the one to take care of flying the cocaine [Eisenhart] traded the plane for and transport it back to the United States." The contemplated transaction never materialized, however, because Eisenhart's plane was subsequently discovered with illegal fuel tanks and seized by government authorities. Nevertheless, in September 1981, Osgood enlightened Eisenhart as to Osgood's cocaine-smuggling system, the "system" to which Dollinger had referred the preceding January.[4]

In December 1981, Dollinger introduced Osgood to Peter Van Flagg in Miami, another distributor of Dollinger-imported cocaine. Osgood and Van Flagg thereafter

---

3. 21 U.S.C. § 841(a)(1).

4. Referring to a previous cocaine-hauling experience in Guiana, Osgood told Eisenhart

[t]hat he would use a small single-engine airplane without any long-range tanks, and he would go from port of entry to port of entry. And before the port of entry, he had [a] little air field where he could land, and he—his partner would take the cocaine out of the airplane and go hide in the jungle. And then he would fly into the port of entry, clear customs, refuel his plane, fly back, pick up his partner and then go on his way to the next country.

explored a narcotics-smuggling scheme whereby Osgood would pilot a small plane to airdrop drugs smuggled across the Mexican border. To initiate this scheme, Osgood and Van Flagg traveled to Bracketville, Texas, where they met with Van Flagg-acquaintance Grover Neuman. The three men then traveled to Neuman's local ranch, where Van Flagg, offering Neuman $40,000 per drop, proposed using the property as an airstrip and for dropping "dope" from an airplane. The following week, in early January 1982, Osgood stopped by Neuman's residence and contributed $500 to Neuman's Justice-of-the-Peace campaign fund. Osgood returned to Bracketville the next Friday with a small gift of cocaine to Neuman from Van Flagg, which Osgood snorted with Neuman and two of Neuman's friends. Despite these lobbying efforts, however, Neuman declined Van Flagg's offer and the Van Flagg-Osgood airdrop scheme apparently dissipated.

In early February 1982, Dollinger, Osgood, and others met with Eisenhart in Houston, Texas, to discuss the recovery of $70,000 worth of Dollinger-fronted cocaine which had been stolen from a local distributor. After an unsuccessful apprehension attempt by Eisenhart, Osgood "said that he had a couple of friends that would help him jack [the suspected thieves] up, so to speak, to try to get the cocaine or whatever they could get." The following March, Van Flagg and two of his associates, cocaine-distributor Leonel Garcia and body guard-collector Marvin "Mountain Man" Matherly,[5] traveled from San Antonio to Houston to help Osgood recover Dollinger's stolen cocaine. The four men located and broke into the suspected thief's apartment. Van Flagg and Matherly gagged and tortured the suspect in an attempt to obtain the cocaine's location, while Osgood and Garcia searched the apartment for money and valuables. These cocaine-recovery efforts, however, proved futile.

In early April 1982, Osgood delivered to Eisenhart a manila envelope containing three packages of cocaine for which Eisenhart and others had fronted Dollinger $30,000 three months earlier. Eisenhart met Osgood at the Houston Intercontinental Airport, where Osgood, stating "here is the stuff," produced the envelope from a suitcase he had placed in the trunk of Eisenhart's car. Later that month, Osgood assisted Van Flagg in delivering cocaine to, and collecting $5,000 from, distributor Donald Wilkins and, on two subsequent occasions, he accompanied Van Flagg when delivering cocaine to Leonel Garcia. The cocaine delivered to Garcia by Dollinger's group on these and other occasions was always packaged the same—in double-wrapped seal-a-meal plastic bags with the inside bag encased in baking soda and white pepper.

The government's evidence established that Osgood and Dollinger had worked together as pilots in 1978, and that Osgood had frequently lived with Dollinger at Dollinger's expense between 1980 and 1982. The government also produced Osgood's personal address book, which contained the names and phone numbers of several individuals associated with importing and distributing Dollinger's smuggled cocaine, including Eisenhart, Van Flagg, Garcia, and Matherly. One entry in the address book included a list of four names, the words "pick luggage" and "plane," a dollar sign, and a small drawing resembling the continent of South America.

## II. THE JENCKS ACT CLAIM

During the examination of Leonel Garcia, who testified as a government witness, it became apparent that DEA agents had interviewed Garcia and others about the case and prepared DEA-6 reports and a related summary based upon these interviews. Defense counsel requested production of this material during Garcia's cross-examination. The government resisted this

---

**5.** Explaining his nickname "Mountain Man," Matherly testified that he is 6'6" tall and weighs over 400 pounds.

request, asserting that the reports and summary were not Garcia's "statements" within the meaning of the Jencks Act, 18 U.S.C. § 3500, and therefore need not be produced. The trial court, at the government's suggestion, conducted an *in camera* inspection and determined that the material contained no substantially verbatim statements of Garcia except certain words and phrases in quotation marks, which the court disclosed. The court then sealed the material as part of the record. Osgood now asserts that the court's determination was flawed, because it was based solely upon inspection of the summary and reports without a hearing and extrinsic evidence concerning their preparation, as required by *Campbell v. United States*, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961), *on appeal after remand*, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963). Alternatively, Osgood contends that if the statements were not producible as Garcia's, they almost surely were producible as those of DEA Agent Richard Braziel, who was involved in the investigation and also testified for the government.

"The Jencks Act limits access by defendants to such government papers as fit the Act's definition of 'statements' which relate to the subject matter as to which the witness has testified." *Campbell*, 365 U.S. at 92, 81 S.Ct. at 425 (citing *Palermo v. United States*, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959)). The Act defines a "statement," at 18 U.S.C. § 3500(e), as:

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording or transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

In *Palermo*, when first addressing the scope and meaning of the Jencks Act, the Supreme Court observed there was no procedure for determining whether a particular statement was producible under subsection (e). 360 U.S. at 354, 79 S.Ct. at 1225–26. The Court also approved the practice in questionable cases of the trial judge making an *in camera* determination, *id.*, and further noted that *"[i]n most cases the answer will be plain from the statement itself."* *Id.* at 355, 79 S.Ct. at 1226 (emphasis supplied). The Court did not, however, require a hearing for the gathering of extrinsic evidence,[6] but instead stated that it is "the function of the trial judge to decide, in light of the circumstances of each case, what, if any, evidence extrinsic to the statement itself may or must be offered to prove the nature of the statement." *Id.* at 354–55, 79 S.Ct. at 1225–26 (emphasis supplied).

■ The subsequent holding in *Campbell* then did not retreat from the Court's earlier position, and, in fact, quoted the aforementioned language from *Palermo* with approval. 365 U.S. at 93, 81 S.Ct. at 425–26 (quoting *Palermo*, 360 U.S. at 354–55, 79 S.Ct. at 1225–26). The Court in *Campbell* stated only that a hearing and certain testimony was required under the circumstances of that particular case, because "[d]etermination of the question whether the Government should be ordered to produce government papers could not be made from a mere inspection of the Interview Report, but only with the help of extrinsic evidence." 365 U.S. at 92, 81 S.Ct. at 425. We do not interpret *Campbell* or any other Supreme Court or Fifth Circuit decision to require a hearing and the consideration of extrinsic evidence in every case in which a Jencks Act issue arises. See *Goldberg v. United States*, 425

---

6. Indeed, the procedure employed in *Palermo*, and approved by the Supreme Court, was apparently limited to an *in camera* inspection of the disputed documents by the trial judge. See *Goldberg v. United States*, 425 U.S. 94, 123 n. 10, 96 S.Ct. 1338, 1346 n. 10, 47 L.Ed.2d 603 (1976) (Powell, J., concurring). The Court noted that the nature of the documents was obvious merely upon inspection. *Palermo*, 360 U.S. at 355 n. 12, 79 S.Ct. at 1226 n. 12.

U.S. 94, 108–09, 96 S.Ct. 1338, 1347, 47 L.Ed.2d 603 (1976), and 425 U.S. at 116–30, 96 S.Ct. at 1351–57 (Powell, J., concurring); *United States v. Merida*, 765 F.2d 1205, 1215–16 (5th Cir.1985); *United States v. Cole*, 617 F.2d 151, 153 (5th Cir.1980), *aff'd on appeal after remand*, 634 F.2d 866 (per curiam), *cert. denied*, 452 U.S. 918, 101 S.Ct. 3055, 69 L.Ed.2d 422 (1981); *United States v. Judon*, 567 F.2d 1289, 1292 (5th Cir.1978), *aff'd on appeal after remand*, 581 F.2d 553 (5th Cir.1978) (per curiam). The premise underlying Osgood's contention, that inspection of the statement alone without extrinsic evidence is necessarily unreliable, belies the Court's observation to the contrary in *Palermo*, 360 U.S. at 355, 79 S.Ct. at 1226; see also *Judon*, 567 F.2d at 1293, as well as the recognized and accepted objective of avoiding "needless trial of collateral and confusing issues while assuring the utmost fairness to a criminal defendant." *Palermo*, 360 U.S. at 355, 79 S.Ct. at 1226; *Goldberg*, 425 U.S. at 122–23, 96 S.Ct. at 1353–54 (Powell, J., concurring).

■ Our examination of the material under seal reveals no error in the district court's Jencks determination. The reports are short, concise summaries of factual accounts as related by Garcia and others to various DEA agents, and the summary is merely a similar compilation of information reflected in certain reports and concerning Garcia's debriefing. The material manifests neither a "substantially verbatim recital of an oral statement," nor evidence of adoption as contemplated by 18 U.S.C. § 3500(e)(1). Defense counsel did not request a statement-adoption hearing, and the court was under no obligation to conduct such a hearing on the basis of the material before it. *See Merida*, 765 F.2d at 1215–16.

■ Osgood's alternative contention, that if they were not Garcia's "statements" the reports and summary should have been disclosed as those of DEA Agent Braziel, is similarly meritless. Each of the reports identifies both its author and source, none of whom is Braziel. Moreover, defense counsel failed to ask whether Braziel authored or adopted any of the disputed material, and Braziel's trial testimony was limited to summarizing the identification and labelling previously introduced government exhibits, for which access to the material would have had no impeachment value whatsoever. Failure to disclose the documents as Agent Braziel's "statements," if error, therefore was clearly harmless. *See United States v. McKenzie*, 768 F.2d 602, 609–10 (5th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986); *United States v. Gaston*, 608 F.2d 607, 611–12 (5th Cir.1979).

## III. CO-CONSPIRATOR ADMISSIONS

At trial, government witness Omar Eisenhart recounted the cocaine-aircraft exchange he had planned with Malte Dollinger in January 1981. According to Eisenhart, Dollinger stated that upon delivery of Eisenhart's plane in Brazil, Osgood would transport the cocaine from South America to the United States; he had done it before and had a "system" for importing it. Osgood now contends that this testimony was improperly admitted as a co-conspirator statement without satisfying the test articulated in *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). Specifically, Osgood contends that it was the only testimony linking him with the importation conspiracy charged, and that it was improperly admitted because (1) there was no evidence showing that he was a member of the conspiracy at the time the statements were made; (2) the trial court failed to determine whether there was sufficient independent evidence of the conspiracy; and (3) the court failed to give a limiting instruction to the jury.

■ In *James*, this court held that a declaration by one conspirator against another is admissible at trial under Fed.R. Evid. 801(d)(2)(E) only if the prosecution, at the conclusion of all the evidence, "has shown by a preponderance of the evidence independent of the statement itself (1) that a conspiracy existed, (2) that the co-conspir-

ator and the defendant against whom the co-conspirator's statement is offered were members of the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy." 590 F.2d at 582. When determining whether *James* is satisfied, the trial judge need not hold a pre-trial hearing, and he may conditionally admit the challenged statement subject to subsequent connection. *Id.* at 581–82; *see United States v. Manzella,* 782 F.2d 533, 545 (5th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986). On appeal, the *James* determination will be affirmed unless found to be clearly erroneous. *United States v. Cochran,* 697 F.2d 600, 605 (5th Cir.1983).

▆▆▆ Initially, we note that admission of the challenged co-conspirator statement in this case was harmless, since Eisenhart's personal discussions with Osgood in May and September 1981, which Eisenhart related at trial, revealed in detail Osgood's cocaine-smuggling "system" and verified that Osgood "was going to be the one to take care of flying the cocaine [Eisenhart] traded the plane for and transport it back to the United States." *See Manzella,* 782 F.2d at 545 (*James* affects the admissibility of co-conspirator statements only; party admissions may come in and serve as independent evidence). Nevertheless, the record also discloses sufficient independent evidence to satisfy *James* and link Osgood with the importation conspiracy charged in the indictment. The testimony of both Eisenhart and his associate, Thomas Pavlo, overwhelmingly established the existence of Dollinger's cocaine-importing enterprise, which employed various couriers toting cocaine-laden luggage. Osgood on at least one occasion personally delivered Dollinger-smuggled cocaine to Eisenhart in Houston, and Osgood's address book contained the names and phone numbers of several involved co-conspirators, as well as an entry with the message "pick luggage" and "plane," a dollar sign, and a small drawing

resembling the continent of South America. Additional independent testimony revealed Osgood's ongoing relationship with Dollinger, Eisenhart, and Peter Van Flagg, another distributor of Dollinger-imported cocaine. It also disclosed Osgood's acknowledged and demonstrated willingness to engage in related cocaine-importing and recovery schemes with all of these individuals. The fact that the challenged statement may have occurred before Osgood joined the conspiracy is of no consequence; independent evidence clearly revealed his subsequent knowledge and willingness to participate. *See Cochran,* 697 F.2d at 603–04. Nor did the trial judge err by failing to delineate findings for the benefit of counsel or to issue a cautionary instruction to the jury. At the close of the evidence, the judge *sua sponte* and without objection stated that *James* had been satisfied by a preponderance of the evidence,[7] and we do not find his conclusion to be clearly erroneous. *See Manzella,* 782 F.2d at 545.

## IV. SUFFICIENCY OF THE EVIDENCE

▆▆▆ Osgood challenges the sufficiency of the evidence underlying two of his three convictions. The record reveals that defense counsel moved for an acquittal following the government's presentation, but thereafter offered evidence without renewing the motion at close of all the evidence. This omission constitutes a waiver of objection to the motion's denial, which, contrary to Osgood's contention, is not otherwise cured by counsel's request for a *James* determination. Appellate review therefore is limited to determining whether there is plain error or whether affirmance of the challenged convictions will result in a "manifest miscarriage of justice." Fed.R. Crim.P. 29(a); *United States v. Gammage,* 790 F.2d 431, 435–36 (5th Cir.1986).

### A. Conspiracy to Import Cocaine

Count I of the indictment charged Dollinger, Osgood, and others with conspiring

---

7. The record shows that the court, at the close of all the evidence, expressly stated that *James* had been satisfied "by a preponderance of the evidence," and further suggested that "[i]f either the Government or the defendant require additional findings, the Court will be glad to consider them now." Defense counsel responded that he had "[n]o objections."

to import cocaine in violation of 21 U.S.C. §§ 952(a) and 963. A section of Count I, entitled "Introduction and Objects of the Conspiracy," stated that Dollinger had imported the cocaine from South America by employing "various couriers" whom he caused "to use specially constructed luggage with hidden compartments especially designed to conceal the cocaine." Osgood, along with others, was then specified to have received Dollinger's cocaine and to have distributed it in the Western District of Texas and elsewhere. On appeal, Osgood admits that "a conspiracy to import cocaine existed." Nevertheless, he contends that the evidence was insufficient to convict him of the conspiracy charged because "there is no evidence that [he] ever saw or handled any double-walled suitcase," and the evidence establishing his agreement and inclination to import reflected schemes not identified in the indictment.

■ There is sufficient evidence to support Osgood's conviction for the importation conspiracy charged, notwithstanding the additional substantial testimony of Osgood's participation in related importing schemes not specifically articulated in the indictment.[8] The essence of a conspiracy under 21 U.S.C. § 952(a) is an agreement between the defendant and others "to import into the United States from any place outside thereof, any controlled substance." *United States v. Conroy*, 589 F.2d 1258, 1269 (5th Cir.), *cert. denied*, 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979). To sustain a conspiracy conviction, the government must establish that a conspiracy existed, that the accused knew of the conspiracy, and that he knowingly and voluntarily joined it. *United States v. Vergara*, 687 F.2d 57, 60 (5th Cir.1982). It also must prove at least the same degree of criminal intent necessary for the underlying substantive offense. *United States v. Nelson*, 733 F.2d 364, 368 n. 8 (5th Cir.), *cert.*

*denied,* — U.S. —, 105 S.Ct. 341, 83 L.Ed.2d 276 (1984). A defendant's mere close association with someone involved in criminal activity will not alone support an inference of guilt. *Vergara,* 687 F.2d at 61. The defendant's knowledge and participation, however, may be inferred from " 'a development and collocation of circumstances,' " *id.* (quoting *United States v. Marx,* 635 F.2d 436, 439 (5th Cir.1981)), and the government need not prove that the defendant knew of all the details, only that he knew of the conspiracy's essential purpose. *United States v. Davis,* 666 F.2d 195, 201 (5th Cir.1982); *Conroy,* 589 F.2d at 1269. In addition, a conviction for conspiracy to import a controlled substance may be sustained although the defendant engaged only in the conspiracy's distribution or delivery aspects after the contraband entered the country; importation is not complete until the drugs reach their final destination. *United States v. Mitchell,* 777 F.2d 248, 261–62 (5th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1493, 89 L.Ed.2d 895 (1986); *United States v. Martinez,* 763 F.2d 1297, 1303–04 (11th Cir. 1985); *see also United States v. Baresh,* 790 F.2d 392, 400 (5th Cir.1986).

■ The conspiracy's essential purpose as charged in this case was the importation of cocaine from South America, initiated by Dollinger's couriers with the aid of specially constructed suitcases, and completed by the further distribution and delivery efforts of Osgood and others. To sustain Osgood's conviction we need review only one transaction: Osgood's April 1982 delivery of Dollinger-imported cocaine to Eisenhart at the Houston Intercontinental Airport. With respect to Dollinger's importing methods and his relationship with Eisenhart, the record is clear. To effectuate this enterprise, Dollinger encouraged the distributors to provide him with "front money" to finance drug-buying trips in re-

---

**8.** Osgood alternatively argues that to sustain his importation-conspiracy conviction on the basis of the evidence reflecting his willingness to engage in cocaine-smuggling schemes using methods not specifically alleged in the indictment would result in an impermissible amendment or variance. Because we find sufficient evidence of his participation in the conspiracy alleged, we need not address these contentions.

turn for increased quality or a reduction in the cocaine's final delivery price. When testifying at trial about the April 1982 cocaine delivery, Eisenhart stated that Osgood delivered a manila envelope containing three packages of cocaine for which Eisenhart and others had "fronted" Dollinger $30,000 three months earlier. Osgood's relationship with Dollinger and Eisenhart, Osgood's documented inclination to engage in related cocaine-importing and recovery schemes with these individuals and Peter Van Flagg, and the names and entries in Osgood's address book, when considered collectively, indicate that Osgood not only knew of the package's contents, but also was aware of its foreign place of origin. Taken with Osgood's actual physical delivery of the package and concurrent acknowledgement, "[h]ere is the stuff," the evidence further establishes Osgood's awareness of the conspiracy and willingness to join. The fact that "there is no evidence that Osgood ever saw or handled any double-walled suitcase," is of no consequence. The evidence supports a reasonable conclusion that he knowingly participated in the conspiracy's delivery end, and that the cocaine was actually imported in the manner specified. That is all that is required. *See Mitchell,* 777 F.2d at 261–62; *Baresh,* 790 F.2d at 400.

### B.  Distribution of Cocaine

Osgood also challenges the evidence underlying his conviction on Count 3 of the indictment, which charged him with distribution of cocaine on or about January 15, 1982, in violation of 21 U.S.C. § 841(a)(1). Specifically, he claims that Grover Neuman's testimony that in January 1982 Osgood gave Neuman a gift of cocaine from Van Flagg—which Neuman, Osgood, and others "snorted"—was insufficient to establish that the substance snorted actually was cocaine. This contention also is meritless.

The identification of a controlled substance may be established by circumstantial evidence, such as lay experience based upon familiarity through prior

use, "so long as the drug's identity is established beyond a reasonable doubt." *United States v. Harrell,* 737 F.2d 971, 978 (11th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 923, 83 L.Ed.2d 935 (1985); *United States v. Crisp,* 563 F.2d 1242, 1244 (5th Cir.1977). In light of the overwhelming evidence of Osgood's cocaine trafficking involvement, and Neuman's testimony that (1) he had used cocaine previously, (2) he was familiar with its effects, (3) the substance produced by Osgood was cocaine, and (4) the substance ingested induced the euphoric feeling with which Neuman had associated his past cocaine use, this threshold was adequately satisfied.

Accordingly, appellant's convictions are AFFIRMED.